The STATE of Ohio, Appellee,

v.

FREEMAN, Appellant.

[Cite as *State v. Freeman* (2000), 138 Ohio App.3d 408.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–990213.

Decided June 9, 2000.

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *Phillip R. Cummings,* Assistant Prosecuting Attorney, for appellee.

*Stephen J. Wenke,* for appellant.

PAINTER, Judge.

In a case turning primarily on the credibility of a police informant, we are constrained to reverse. The evidence was not sufficiently overwhelming to overcome prosecutorial error. While we understand that much of the error arose in the "heat of battle" in the courtroom, and that the assistant prosecutor probably did not set out to make improper comments, we must consider the comments' effect, not the prosecutor's intent. The fairness of the trial was undermined, and we remand for a new trial.

## I. Trial and Sentence

Appellant George Freeman was indicted on two counts of trafficking in crack cocaine. The first count charged him with trafficking in an amount greater than twenty-five grams, but no more than one hundred grams. The second count

charged Freeman with trafficking in an amount that exceeded one hundred grams, and contained a specification identifying Freeman as a major drug offender. A jury acquitted him of the first count and found him guilty of the second. It determined that the amount of crack cocaine involved was 117.65 grams. The trial court determined that Freeman was a major drug offender and ordered him to serve consecutive ten-year sentences for the trafficking conviction and the major-drug-offender specification.

In his appeal, Freeman raises five assignments of error. In his first assignment, he raises an ineffective-assistance-of-counsel claim. In his second and third assignments, he challenges the sufficiency and the weight of the evidence supporting his drug-trafficking conviction. Freeman attacks the conduct of the assistant prosecuting attorney in his fourth assignment. In his last assignment, Freeman challenges the validity of a search warrant based on allegedly false statements contained in the supporting affidavit. Because we reverse Freeman's conviction for other reasons, we need not address his ineffective-assistance-of-counsel claim or his weight-of-the-evidence claim.

## II. The Target and the Busts

This case relates back to the arrest of Anthony Collins by Cincinnati police officer Tom McDaniel. McDaniel, a member of the Cincinnati Police Department's drug unit, Operation Street Corner, was the case officer on Collins's case. He was also the case officer on Freeman's case. (A case officer is the officer who originates and orchestrates the investigation.) Because of Collins's arrest, Collins Jones, Collins's brother-in-law and good friend, offered to act as a confidential informant to help Collins. In return, Jones hoped that Collins would get some leniency. Jones, himself, had been imprisoned at least twice on drug charges. Because their names are so similar, it is important to keep in mind that two of the principal figures in this case are Anthony Collins and Collins Jones. We refer to them as Collins and Jones, respectively.

According to Jones, the police specified Freeman as the person from whom they wanted him to purchase drugs, and they gave him Freeman's address. In contrast, McDaniel testified that while Freeman was a target, Jones was not specifically asked to target Freeman. According to McDaniel, Jones indicated that he could make a buy from Freeman and gave McDaniel Freeman's address. Jones and the police agreed that Jones would make crack cocaine purchases from Freeman.

### A. The Buy–Walk

Jones set up the first deal with an unmonitored telephone call to Freeman. They met at Freeman's residence, located at 825 Oak Street, and, as previously

instructed, Jones told Freeman that he wanted to purchase two ounces of crack cocaine. Freeman told him that the crack cocaine sold for $800 an ounce, but that he would charge Jones only $1,500. Jones arranged with Freeman to meet again at Freeman's residence the next day, July 23, 1998. The police monitored none of this interaction. After leaving Freeman's residence, Jones met with the police officers and told them what had occurred.

On July 23, Jones and Collins met with the officers, who searched both of them and their vehicle. The officers placed a transmitter on Jones and gave him $1,500. Jones testified that the money came from the officers. McDaniel testified that the money was Collins's personal money. According to Jones, Collins drove him to 825 Oak Street, a building that contained several apartments. Jones entered the building and waited downstairs, where Freeman joined him. They sat and talked for awhile. Freeman left and returned. At that time, Jones bought the two ounces of crack cocaine from Freeman and paid him $1,500. This transaction took about forty-five minutes. The transmission of the transaction was also recorded on audiotape. According to McDaniel's testimony, the transaction took time because Freeman was waiting for a supplier to bring the drugs. The police referred to this transaction as a buy-walk because no attempt was made to arrest Freeman.

Jones returned to the waiting police officers and gave them the crack cocaine. The police again searched him, Collins, and the vehicle they were driving. Freeman was not arrested after the transaction because McDaniel wanted to set up a larger purchase.

## B. The Buy–Bust

On August 11, 1998, Jones made a second drug purchase from Freeman. To set up the purchase, Jones made a telephone call to Freeman and arranged a meeting to negotiate the deal. Pursuant to police instructions, Jones told Freeman that he wanted to purchase five ounces of crack cocaine. Freeman gave him a price of $4,000. This interaction was unmonitored. Before the buy, Jones and Collins met the police officers at a designated place where the officers searched them and their vehicle. They placed a transmitter on Jones and provided him with $4,000 in marked bills. (The bills had been photocopied earlier so that the police could compare serial numbers on any money confiscated from Freeman's apartment after his arrest.)

Jones made a telephone call to Freeman, and Freeman told him to come to his apartment. When Jones arrived, he waited in a hallway. He and Freeman then went into a room, and Jones allegedly made his purchase. This interaction was also transmitted and audiotaped. Jones left the apartment and got in Collins's

car. The police directed them to an area where they and their car were searched, and where Jones turned over the crack cocaine.

After Jones left the apartment, the officers arrived. A man identified by Officer Daniel Schoenfelt as a lookout, who was later arrested for obstructing official business, yelled, "Here they come." The police entered the house to "freeze" the scene until a search warrant could be obtained. Fourteen or fifteen police officers entered the apartment, and they found thirty people inside.

Sergeant Jeffrey Butler was one of the first officers to enter the apartment. After entering, he went through a side door upon hearing a toilet being flushed. While he was trying to open the bathroom door, he heard several more flushings. Upon opening the door, he found Freeman and a woman he identified as Kimberly Davis, Freeman's girlfriend, inside. He pulled them out of the room and patted Freeman for weapons. He discovered a large amount of money in Freeman's pants pocket, which Freeman said belonged to him. Strangely, Butler put the money back in Freeman's pants for another officer to retrieve. He then left, apparently to obtain a search warrant. McDaniel testified that he asked Freeman if the money was his, and that Freeman responded that it was. Freeman also told McDaniel that he did not sell drugs.

Several other police officers testified at trial about the drugs and the money, including officers John Hayes, Greg Kamer, and Michael Hudepohl. Hayes, whose job was to retrieve the money during the bust, took the money from Freeman's front pants pocket and asked Freeman if the money was his. Freeman stated that it was and asked whether he was going to get it back. Hayes testified that he read Freeman his *Miranda* rights and that Freeman seemed to understand them. Hayes put the money in the trunk of a police car. The money was subsequently returned to the unit office and was signed into the criminal pursuit fund.

Officer Kamer had initially made photocopies of the $4,000 used in the transaction. He testified that after the bust the money was returned to him at the unit's office. According to Kamer, he and McDaniel each compared portions of the money taken from the bust with the photocopied bills. The money taken from Freeman contained the $4,000 provided to Jones for the purchase of crack cocaine and $1,392 of unmarked money.

Officer Hudepohl testified that, while at Freeman's apartment, he received the crack cocaine purchased earlier by Jones from Freeman. Hudepohl put the crack cocaine in the trunk of a police car, and after "processing prisoners," he tagged the cocaine, completed a property envelope, a laboratory admission sheet, and a receipt for the property book, and weighed and sealed the crack cocaine.

The state did not offer the tape recordings of the drug transactions. According to testimony at trial, the recordings were unintelligible as compared to the live transmission that the officers heard during the transactions. According to McDaniel and Schoenfelt, the police observed Jones as he entered Freeman's apartment, and Jones was monitored throughout the two actual purchases.

### C. The Search Warrant and Inventory

Butler provided the affidavit for the search warrant for "825 Oak Street, Apartment Number 2. The first floor front apartment of the red brick multi-family building. The said apartment having the Number 2 written in marker on the entry door." He also indicated that the warrant was for "drugs and drug paraphernalia, to wit, heroin * * *." The affidavit also indicated that Butler was the officer who had met with Jones, searched Jones, and provided him with the currency. It also stated that Jones had returned a quantity of heroin to Butler that field-tested positive for heroin. According to Butler and Officer Cheryl Hart, the other two floors of the building were searched by consent. According to Butler, the fact that the warrant was for the search of "heroin" was a mistake.

Hart was in charge of inventorying the items found in the house. According to her testimony, the officers found no pagers, cell telephones, drugs, or weapons. She did inventory the mailbox tag, which indicated that George Freeman, Jr., resided at 825 Oak Street. She described the building as a three-story house with multiple apartments and tenants. According to the consent-to-search form obtained by Hart, James Willis consented to the search. (Willis was the tenant of a second-floor apartment.) The form signed by Willis gave the police permission to search the second floor and to remove items from his apartment on the second floor. Hart described the consent as being for the second and third floors.

### D. The State's Drug Analysis

Two drug analysts from the Hamilton County Coroner's Office testified at trial. Tracey Rauch testified that the substance obtained from the July transaction was crack cocaine. She testified that, at the time she received it, it did not appear to have been tampered with. According to her report, the crack cocaine weighed 46.48 grams. She testified that a discrepancy between the weight she measured and the weight measured several months later by Freeman's expert would not be surprising based on the use of some of the crack cocaine for testing and evaporation of water. She explained how crack cocaine was manufactured and stated that the inconsistent quality of processing had an effect on the amount of water crack cocaine might contain. She also testified that a difference in weight between 117.65 grams and 107.17 grams, when the crack cocaine from the August purchase was weighed in August and again in December, would not be surprising for the same reasons—testing and evaporation. During her testimony, it became

evident that the bag containing the cocaine had a hole in it when a small particle leaked out.

The other analyst, Brian Scowden, testified that the substance from the August sale was crack cocaine and that it weighed 117.65 grams. He testified that he saw no indication of tampering with the cocaine.

### E. Freeman's Defense

During McDaniel's cross-examination, he acknowledged that Collins's case had proceeded during the same time that Freeman's case had, although Collins had been indicted earlier. He also testified that when Freeman's case was continued, Collins's case was too. He informed defense counsel that Collins's case was no longer pending when Jones testified. On redirect, McDaniel testified that Collins had been found guilty of a second-degree felony. McDaniel also acknowledged that he had arrested Collins for possession of heroin after the first arrest and that those charges had been "ignored" by the grand jury. (Presumably, this meant that Collins was not indicted on those charges.)

Freeman's counsel cross-examined McDaniel on the fact that he had been involved with an earlier arrest of Freeman that had gone to trial and ended in an acquittal. On redirect, McDaniel related more details about that prosecution, stating that he had observed Freeman throwing a bag of cocaine out the window. When asked on recross whether the jury had believed his testimony in the prior case, McDaniel acknowledged, "Apparently not."

Larry M. Dehus, a forensic scientist, testified for the defense. He testified that the substance in the two exhibits purporting to be the crack cocaine purchased from Freeman was crack cocaine. When Dehus weighed the substance from the July purchase, he obtained a weight of 34.63 grams. When he weighed the crack cocaine from the August purchase, he obtained a weight of 107.17 grams. Both of these weights were less than those recorded by the state's drug analysts. Dehus testified that he had never encountered such large discrepancies before. He disagreed with Rauch's conclusion that the difference could be from evaporation and testing. Dehus concluded that the discrepancies could be only from weighing error, mix-up of specimens, or intentional or accidental loss of material.

Carl Clark, Freeman's brother-in-law, testified that on August 11, 1998, he picked up Freeman at his mother's house to drive him to the Oak Street address for the purpose of retrieving some items for Freeman's nephew. On the way, Clark stopped for gas. Freeman offered to pay and pulled a large roll of bills from his pocket. When Clark asked him why he had so much money, Freeman told him that he did not trust banks. He had the money in the front pocket of his shorts.

When they arrived at the Oak Street address, they entered and Freeman went upstairs to "holler at" his children. Clark went to the third floor. He saw Kimberly Davis there and never saw her leave the third floor. While he was there, Jones arrived and came to the third floor, where he used the telephone. After hanging up the telephone receiver, Jones told Clark that he had to wait for somebody. At that time, Freeman told Clark and Denise Varner, who was also present, that they should go downstairs and gather the items for his nephew. They went to the first floor and started putting things in bags. Jones, by that time, was also downstairs.

Clark soon returned to the second floor to sit because he was unable to do heavy lifting. He stayed there for five or ten minutes. When he returned downstairs, Jones was gone, but Freeman and Varner were still there. After he returned to the second floor, which contained two apartments, the police made their entrance.

### III. Prosecutorial Misconduct

We address first Freeman's fourth assignment in which he argues that he was denied a fair trial because of seven instances of prosecutorial misconduct during the state's closing argument. According to Freeman, the state denigrated the role of defense counsel and the trial as a whole when the assistant prosecutor implied that defense counsel did not believe his case by stating, "It is like poker; if you get dealt bad cards, you got to play them." Freeman objected and moved for a mistrial. The objection was overruled and his motion denied. Freeman also asserts that the state denigrated the role of his defense expert by stating, "He came in under the guise of being a scientist and give [sic] you folks an opinion based upon, I think, the perception that he is being scientific." No objection was made to this comment.

Freeman next claims that the assistant prosecutor referred to facts not in evidence and inferred that Freeman would seek retribution against Jones for testifying, by referring to the number of Freeman's friends in the courtroom. Freeman's objection was overruled. Next, Freeman claims as improper the assistant prosecutor's statements that implied Freeman lived in a crack house in a bad neighborhood. Freeman's objection to this comment was sustained.

Freeman further claims that the state impermissibly shifted the burden regarding the playing of the alleged audiotapes of the drug buys by the prosecutor, stating, "If this tape were to be played, I'm not the only person to play it. I brought it out." The trial court sustained Freeman's objection. His sixth complaint is that the assistant prosecutor offered personal testimony when he said, "Counsel says that Anthony Collins' case was ignored by the Grand Jury. I have no idea why they were ignored by the Grand Jury." Freeman objected to

this comment, and the trial court overruled his objection. His last claim of improper conduct concerns a reference to evidence outside the record when the assistant prosecutor stated, "Big-time dope dealers have a lot of money and * * *." Freeman objected to the comment. The trial court sustained his objection and instructed the jury to disregard it.

## A. Standard of Review

"[P]rosecutors serve a special role in our justice system requiring them to adhere to the highest standards and to avoid improper arguments, insinuations, and assertions calculated to mislead the jury."[1] It is as much the duty of the prosecutor "to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."[2]

For a conviction to be reversed for prosecutorial misconduct, a reviewing court must determine that the remarks were improper and that they "prejudicially affected the substantial rights of the accused."[3] Whether the trial is fair is the "touchstone of analysis."[4] As to the propriety of comments, this court has explained in *State v. Hart*[5] that the prosecutor has wide latitude in summation and "may comment upon the testimony and suggest the conclusions to be drawn."[6] This latitude, however, does not "encompass inviting the jury to reach its decision on matters outside the evidence adduced at trial" or "allud[ing] to matters not supported by admissible evidence."[7]

[4-6] If a remark was improper, a reviewing court must determine whether it was so prejudicial as to deny a defendant a fair trial. To be prejudicial, "[t]he remarks must have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[8] The improper conduct "should be assessed

---

1. *State v. Fears* (1999), 86 Ohio St.3d 329, 351, 715 N.E.2d 136, 156 (Moyer, C.J., concurring in part and dissenting in part), certiorari denied (2000), 529 U.S. 1039, 120 S.Ct. 1535, 146 L.Ed.2d 349.

2. *Id.*, quoting *Berger v. United States* (1935), 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1314.

3. *State v. Smith* (2000), 87 Ohio St.3d 424, 442, 721 N.E.2d 93, 112.

4. *Id.*

5. *State v. Hart* (1994), 94 Ohio App.3d 665, 671, 641 N.E.2d 755, 759.

6. *Id.* at 671, 641 N.E.2d at 759.

7. *Id.* at 672, 641 N.E.2d at 759.

8. *Id.* at 674, 641 N.E.2d at 761, quoting *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431, 437.

within the context of the entire case, and more particularly the entire closing argument to determine whether it was prejudicial." [9] We must also consider the cumulative effect of improper comments, because "[e]rrors that are separately harmless may, when considered together, violate a person's right to a fair trial." [10]

### B. Being Dealt a Bad Hand of Poker

The assistant prosecutor prefaced his first objected-to comment with the statement that he was not impugning defense counsel's ability. We agree that the assistant prosecutor's statement that Freeman's counsel was dealt bad cards and had to play them did not denigrate counsel. It did inject into the state's argument, however, an imputation of insincerity toward defense counsel. A comment that suggests that defense counsel believes his client is guilty is forbidden. This is because "if the jury believes that even the defendant's own advocates think him guilty, that belief will naturally carry great weight in their deliberations. The jury is also likely to resent defense counsel's perceived insincerity." [11] Thus, we hold that the assistant prosecutor's remark was improper. [12]

### C. Under the Guise of an Expert

The assistant prosecutor's comment that Dehus, the defense expert, testified in the "guise" of a scientist was a misstatement of the evidence. The evidence clearly demonstrated that Dehus was a forensic scientist. And, in fact, the state was willing to stipulate to Dehus's qualifications. The assistant prosecutor's comment inferring otherwise falsely impugned Dehus's qualifications as an expert, and was not proper. The state's challenge to Dehus's opinion because it was allegedly premised on anecdotal evidence—a fact brought out by the state in cross-examination—was not improper.

### D. Revenge–Seeking Friends

The state put into evidence at trial that several of Freeman's friends were in the courtroom. Defense counsel put into evidence that dealing in drugs and acting as a confidential informant were life-risking activities. The assistant prosecutor used the fact that Jones implicated Freeman in front of his friends to argue against the defense theory that the police conspired to set up a fake drug

---

9. *Id.*

10. *State v. Madrigal* (2000), 87 Ohio St.3d 378, 397, 721 N.E.2d 52, 70.

11. *State v. Keenan* (1993), 66 Ohio St.3d 402, 406, 613 N.E.2d 203, 207.

12. See *State v. Smith* (1998), 130 Ohio App.3d 360, 720 N.E.2d 149.

transaction. According to the state's argument, Jones would have had no incentive to conspire with the police in light of the possible consequences. While not directly arguing that Freeman's friends were revenge-seeking thugs, the assistant prosecutor conveyed that conclusion to the jury. There is nothing to support the inference that Freeman's friends in the courtroom were going to seek retribution. The assistant prosecutor's comment was improper.

### E. Crack House

██ Freeman next argues that the assistant prosecutor improperly argued that Freeman lived in a crack house when there was no evidence to support that comment. The trial court sustained the objection. A review of the record, however, demonstrates that two different police officers described 825 Oak Street as a crack house, without objection. We believe the remark was proper in light of the evidence, and the trial court wrongly sustained Freeman's objection.

### F. Audiotapes

██ Freeman next argues that the state improperly shifted the burden of proof to the defense when, in closing argument, the assistant prosecutor argued:

"Now you folks want to sit here in a courtroom and listen to five tapes of a bunch of static and some (mumbling) and stuff like that that I would offer?

"Do I want to do that to my trial?

"Do I want to sabotage my trial in that fashion? Just absolutely waste everybody's time; then after I play the tapes say, 'Officer, could you tell us the quality of those tapes versus the quality of your transmission?'

"Yes, they stink. They are not good.

"We try to get them. Sometimes we do; sometimes we don't.

"You heard Sergeant Butler say that the further away you are from the transmitter, the weaker the signal is.

"If this tape were to be played, I'm not the only person to play it."

At trial Jones and McDaniel testified that Jones bought the crack cocaine from Freeman and that the drug buys were monitored as they occurred by the police listening to a transmission of each of the two transactions. Throughout the three days of trial, the jury saw five audiotapes sitting on a "code book." The state asked McDaniel whether the audiotapes were the surveillance tapes, to which he responded that they appeared to be. McDaniel was asked if he had listened to the tapes, and he responded, "A little bit." He testified that the sound quality was very poor. The assistant prosecutor then asked, "Think if the jury listened to those tapes they would be able to understand any of the things that you heard

over the transmitter?" McDaniel responded, "Probably not." Schoenfelt also referred to the audiotapes. The tapes were not offered into evidence and were never heard by the jury.

We see a problem with the audiotapes that was exacerbated by the state's closing argument. The jury had before it five surveillance tapes that allegedly contained recordings of Freeman selling drugs to Jones. Without being provided the opportunity to hear the tapes, the jury was led to believe that all the audiotapes contained evidence that corroborated Jones's testimony. The use of the unheard evidence in this way improperly bolstered Jones's testimony.

These unplayed audiotapes, sitting on a book of law, constituted what is known as a "dumb show." A "dumb show" is an "ingenious effort to distract or mislead the jury." [13] While some "dumb shows" are not necessarily prejudicial or even inappropriate, we believe that the display of the audiotapes in this case was improper because the jury could have inferred that all five audiotapes contained information that corroborated Jones's story.

Further, in his closing argument, the assistant prosecutor impermissibly shifted the burden to the defendant to prove that the tapes did not corroborate Jones's testimony. Obviously, the inference presented to the jury was that if the audiotapes exonerated Freeman, the defense would have played them. It seems fundamentally unfair that the jury was allowed to view five audiotapes through-out a three-day trial, only to be told that the tapes recorded Freeman selling crack cocaine to Jones, but then not to be permitted to hear the evidence, regardless of its allegedly poor quality.

The state argues that the statements were an invited response to Freeman's closing argument, which questioned the state's allegations that the tapes were of poor quality and which generally attacked the police investigation. No objection was made to Freeman's argument. This would have been more appropriate than the state's disproportional response.[14] Where the state's case depended on the credibility of Jones, it was not only improper, but also prejudicial for the state to infer that Freeman could have used the allegedly worthless tapes to exonerate himself.

### G. Personal Testimony

In his sixth claim of improper conduct, Freeman argues that the assistant prosecutor offered personal testimony when he said that he had no idea why Collins's cases were ignored by the grand jury. This comment was made in

---

13. Underwood and Fortune, Trial Ethics (1988), Chapter 11, at 317.

14. Accord *State v. Coffman* (1998), 130 Ohio App.3d 467, 720 N.E.2d 545.

response to Freeman's counsel's comment that Collins committed a crime and was not going to pay. The remark could have conveyed to the jury that the state had in fact made no deal with Freeman—the prosecutor certainly would have known. This was personal testimony by the assistant prosecutor. Therefore, the prosecutor's statement was improper.

### H.   Unsubstantiated Comment

The assistant prosecutor's last comment that "Big-time dope dealers have a lot of money" was not substantiated by or based on admitted evidence and was highly inflammatory. The trial court acknowledged the impropriety of the comment when it sustained the objection and instructed the jury to disregard the comment.

### I.   Reversible Error

The trial court sustained correctly only two of Freeman's six objections and erroneously overruled three of his objections. (The comments regarding Freeman's expert were not objected to at trial.) We first note that the trial court's overruling of an objection gives "the prosecutor's comment its approval in the jury's eyes." [15]   To reverse based on the prosecutor's remarks, however, we must conclude that the cumulative effect of the prosecutor's misconduct prejudicially affected Freeman's substantial rights and that the evidence adduced at trial was not so compelling that a jury would have found Freeman guilty beyond a reasonable doubt absent the improper comments.

Under the facts of this case, we conclude that Freeman was denied a fair trial. The trial court failed to sustain several proper objections, much less to admonish the assistant prosecutor for his improper comments. The jury was provided with a single curative instruction. The evidence against Freeman was not overwhelming, and it depended primarily on the credibility of the witnesses. Viewing the trial as a whole, we conclude that the assistant prosecutor's closing argument contained improper comments, and that when those comments are evaluated in the context of the entire trial, Freeman was deprived of a fair trial.

While we recognize intellectually and emotionally that it may be difficult for restraint to prevail in the heat of the battle, "prosecutors must be diligent in their efforts to stay within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts." [16]   We sustain Freeman's fourth assignment.

---

**15.**   *State v. Keenan,* 66 Ohio St.3d at 410, 613 N.E.2d at 210.

**16.**   *State v. Fears,* 86 Ohio St.3d at 332, 715 N.E.2d at 143.

## IV. Other Assignments

Because we sustain Freeman's prosecutorial-misconduct claim, his conviction must be reversed and the case remanded. As a result, we do not address Freeman's claims that his conviction was against the manifest weight of the evidence and that he was denied effective assistance, because they are moot. We do address his claim concerning the sufficiency of the evidence, however, because, if we sustain that claim, the state will be barred from retrying Freeman.[17] We also address his claim concerning the validity of the search warrant, because, in the event of a retrial, the validity of the warrant may again be at issue.

### A. Sufficiency of the Evidence

In his second assignment, Freeman contends that his conviction was not supported by sufficient evidence. A review of a sufficiency-of-the-evidence claim requires us to determine whether the evidence, viewed in a light most favorable to the state, could have convinced any rational trier of fact, beyond a reasonable doubt, that Freeman had knowingly sold crack cocaine in an amount exceeding one hundred grams.[18]

Freeman argues that there was insufficient evidence to show that Jones had made the purchase from Freeman, because the police had improperly monitored his actions. According to Freeman, Jones could have made the purchase from other people in the apartment or that he could have planted the crack cocaine on one of his unmonitored visits. Jones testified that he bought five ounces of crack cocaine from Freeman for $4,000. Various police officers testified that the $4,000 found in Freeman's pocket was the money provided to Jones by the police, and that Freeman stated that the money was his. The evidence provided by the experts indicated that the crack cocaine purchased in August was more than one hundred grams. Concluding that the evidence was sufficient to support Freeman's conviction, we overrule his second assignment.

### B. Invalid Search Warrant

In his last assignment, Freeman contends that the trial court erred by admitting into evidence items seized pursuant to a search warrant that was premised on an affidavit containing false statements. Specifically, Freeman argues that Butler provided false statements that he had met with Jones, when he had not; that he had met with, searched, and provided money to Jones within seventy-two hours of signing the affidavit, which he had not; and that he had

---

17. See *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 547.

18. See *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

observed Jones enter Freeman's apartment and return with a substance that had field-tested positive for heroin, when that had not occurred. (Freeman had moved to suppress evidence because his arrest was not supported by probable cause. The record contains no entry regarding the trial court's decision on the motion, but because the evidence was presented at trial, we assume the motion was denied. The transcript of the suppression hearing was ordered by Freeman and used for impeachment at trial, but it has not been made a part of the record before us. It is not clear that Freeman challenged the validity of the affidavit in his motion to suppress.)

Freeman also challenges the admission of the mailbox tag, because it was outside the scope of the items described in the warrant. He also contends that the money recovered from him was never inventoried. No objections were made to the admission of the evidence at trial based on the affidavit or the inventory sheet.

"Misstatements, inaccuracies, and misdescriptions in an affidavit generally do not invalidate an otherwise valid search warrant unless the defendant establishes 'by a preponderance of the evidence that the affiant made a false statement, either "intentionally, or with reckless disregard for the truth." ' " [19] " 'Reckless disregard' means that the affiant had serious doubts of an allegation's truth. [Citation deleted.] Omissions count as false statements if 'designed to mislead, or * * * made in reckless disregard of whether they would mislead, the magistrate.' [Citation deleted.]" [20]

To challenge the accuracy of statements made in a supporting affidavit, the defendant must provide "an offer of proof which specifically outlines the portions of the affidavit alleged to be false, and the supporting reasons for the defendant's claims. This offer of proof should include the submission of affidavits or otherwise reliable statements, or their absence should be satisfactorily explained." [21] If the defendant meets this burden, the warrant may still be upheld, unless it is insufficient to establish probable cause when examined without the improper statements. [22] "Thus, if the misstatements or inaccuracies are not material to a finding of probable cause to search, the warrant remains valid." [23]

---

19. *State v. Russell* (June 30, 1998), Athens App. No. 97CA37, unreported, 1998 WL 357546, quoting *State v. Waddy* (1992), 63 Ohio St.3d 424, 441, 588 N.E.2d 819, 832.

20. *State v. Waddy* (1992), 63 Ohio St.3d 424, 441, 588 N.E.2d 819, 832.

21. *State v. Roberts* (1980), 62 Ohio St.2d 170, 178, 16 O.O.3d 201, 206 405 N.E.2d 247, 253.

22. See *State v. Waddy*, 63 Ohio St.3d at 441, 588 N.E.2d at 832.

23. *State v. Russell, supra.*

We conclude, based on the record before us, that Freeman failed to sustain his burden to invalidate the warrant for his apartment. Without a transcript of the hearing below, we cannot determine whether the issue was raised, or, if it was, what proof Freeman provided.

Further, the fact that it was another police officer and not Butler who had met with Freeman during the instances indicated in the affidavit (as McDaniel testified at trial), and the fact that the search was for crack cocaine, and not heroin (which Butler testified was his mistake), raise a question whether the misstatements would have been crucial to establishing probable cause, if the issue had been raised below.

We are troubled by the fact that the inventory sheet failed to indicate the money taken from Freeman, but the evidence at trial sufficiently demonstrated how the money was taken and processed by the police. We do not necessarily conclude that the taking of the mailbox tag was outside the scope of the warrant, where the tag was merely indicative of Freeman's residence.

## V. Conclusion

Because we conclude that the assistant prosecutor's improper comments deprived Freeman of a fair trial, we reverse the trial court's judgment. This cause is remanded for further proceedings consistent with this Opinion.

*Judgment reversed*
*and cause remanded.*

DOAN, J., concurs.

HILDEBRANDT, P.J., concurs in part and dissents in part.

HILDEBRANDT, Presiding Judge, concurring in part and dissenting in part.

I concur in the majority's disposition of Freeman's first, second, third, and fifth assignments of error. However, I dissent from the majority's decision sustaining Freeman's fourth assignment of error, because I do not believe that the prosecutor's statements during closing argument, even if improper, deprived Freeman of a fair trial.

Before this court may reverse a conviction based on prosecutorial misconduct, we must determine that the remarks of the prosecutor were improper and that they "prejudicially affected the substantial rights of the accused."[24] The issue is

---

24. *State v. Smith* (2000), 87 Ohio St.3d 424, 442, 721 N.E.2d 93, 112.

the fairness of the trial, not the culpability of the prosecutor.[25] I would conclude that the comments made by the prosecutor during closing argument, whether considered alone or cumulatively, did not so prejudice Freeman as to deprive him of a fair trial. The trial court admonished the jury that closing arguments were not evidence, and Freeman has raised no other evidence of misconduct during the course of the trial.

For the foregoing reasons, I respectfully dissent from the majority's disposition of Freeman's fourth assignment of error. I concur in the disposition of the other assignments of error.