OPINION
{¶ 1} This is an appeal by defendant-appellant, Franklin D. McLean, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas following a jury trial in which appellant was found guilty of kidnapping, abduction and attempted rape.
 {¶ 2} On September 29, 2003, appellant was indicted on two counts of kidnapping, in violation of R.C. 2905.01, one count of rape, in violation of R.C. 2907.02, one count of aggravated burglary, in violation of R.C.2911.11, one count of burglary, in violation of R.C. 2911.12, and one count of felonious assault, in violation of R.C. 2903.11. The indictment arose out of an incident on November 13, 2002, when police officers were dispatched to an apartment concerning a reported hostage situation.
 {¶ 3} The matter came for trial before a jury beginning on April 6, 2004. The following facts were presented during the state's case-in-chief. In 1999, Mira Poland began renting an apartment at 4243 Morsetown Court West, residing there with her son Jaylen. In the summer of 2001, appellant and Poland began living together at the apartment. He moved out approximately six to eight months later, but he returned at the end of the summer of 2002, to again reside at the apartment with Poland.
 {¶ 4} On November 7, 2002, Poland ended her relationship with appellant; she was upset with appellant after learning that, during an approximate two-week period when she was out of town, he had left Jaylen, then age eight, unattended at the apartment during the late evening and early morning hours. On November 7, Poland and Jaylen left the apartment to stay with her mother, and she informed appellant that he had three days to vacate the apartment. Poland would return to the apartment in the evenings to get clothes for work the next day, and she would also return in the mornings so that Jaylen could go to school with a neighbor friend. Until the day of the incident, however, Poland had not seen appellant at the apartment.
 {¶ 5} On the morning of November 13, 2002, at approximately 6:00 a.m., Poland and Jaylen went to the apartment so that Jaylen could pick up a library book before going to school. Upon entering the apartment, Jaylen went upstairs to get the book, while Poland remained downstairs. As Jaylen started coming down the stairs, he and his mother first realized appellant was in the apartment.
 {¶ 6} Appellant told Jaylen to go back upstairs, and he told Poland they were going upstairs to talk. Poland responded that she did not want to talk to him, and that she was going to be late for work, but appellant told her "nobody was leaving." (Tr. 139.) Jaylen and Poland were both fearful because of the look in appellant's eyes.
 {¶ 7} Poland then told appellant she would "go upstairs and we could talk, but there was really nothing to talk about." (Tr. 140.) As they got to the top of the stairs, appellant grabbed her and asked "why I did this to him, why I locked him out." (Tr. 140.) Appellant told Poland that "nobody was going to be walking out," and that he would "kill both of us before anybody would be released." (Tr. 140.) Appellant then grabbed Poland's coat and proceeded to choke her with the coat collar.
 {¶ 8} Jaylen observed appellant start to choke his mother. She was screaming for help, and appellant tried to push her over the rail of the stairs. Jaylen attempted to call police, but appellant pushed him back into his room.
 {¶ 9} Appellant then attempted to push Poland into the bedroom, and he grabbed her by the neck from behind. Poland managed to get out of the headlock, and she screamed to a neighbor to call 911. Appellant grabbed her again and she went down on the ground "on all fours." (Tr. 143.) Poland maneuvered her body so that she could swing over the top of the steps, and "the weight pulled both of us down the steps." (Tr. 143.) After they tumbled down the steps, appellant grabbed her again and resumed choking her. He was choking her "[w]ith both hands and his thumbs," and he told her that she was going to die. (Tr. 144.) Eventually, appellant let go and told Poland "he loved [her] so much that he could not kill [her]." (Tr. 144.)
 {¶ 10} By that time, police officers arrived at the scene and they attempted to talk to appellant through the wall. At one point, appellant told Poland "he was going to go ahead and just settle everything." (Tr. 146.) Appellant took a hanger and put it under his shirt. He told Poland that, if he could not kill her, "he would make sure that they [the police] would kill him." (Tr. 146.) A hostage negotiator then phoned the apartment.
 {¶ 11} Appellant wanted to go back upstairs, so they went up to the bedroom, where Poland noticed a butcher knife on the dresser. Appellant grabbed the knife and kept it in his hand. During this time, hostage negotiators made several more calls. Columbus Police Detective Dana Farbacher, who has training as a hostage negotiator, testified that he attempted for several hours to persuade appellant to come out of the residence through telephone conversations. Appellant indicated that "he was not coming out and he was not letting anybody else come out." (Tr. 41.) At one point, the detective heard "a very loud argument going on" inside the residence. (Tr. 42.) Detective Farbacher also spoke with Poland during this time, and she informed the officers that appellant "was not allowing her to leave the home, that he was armed with a knife." (Tr. 43.)
 {¶ 12} Upstairs, appellant told Poland "he needed to just spend his time with me because it was the last time that we were going to be able to spend together, and it would turn to where he felt I didn't deserve to walk out so he would just kill me." (Tr. 151.) At one point, appellant told Poland to lie down and to take her panties off. Poland removed her stockings and panties, and "[h]e proceeded to try and have sex with me." (Tr. 152.) Appellant prematurely ejaculated before penetration occurred. Poland testified that she was scared and fearful.
 {¶ 13} Eventually, during one of the conversations with the negotiators, appellant told them to "[j]ust give me ten minutes." (Tr. 156.) When he hung up the phone, he told Poland that he loved her, and that "he felt he probably would let me go." (Tr. 156.) The phone rang again, and appellant threw it against the wall. He then broke down and started crying. Appellant then called Jaylen into the room and told them he was going to let them go, and he wanted Jaylen to forgive him for what he had done. Poland and Jaylen then left the apartment.
 {¶ 14} Poland and her son came out of the residence at approximately 12:30 p.m., and Detective Farbacher described Poland as "frazzled, harried, clearly someone who had just been through a very stressful situation." (Tr. 44.) Columbus Police Detective Robert Moledor spoke with Poland, who was upset and fearful. Appellant remained in the house for several hours until he was eventually apprehended by SWAT officers who entered the residence.
 {¶ 15} Poland was transported to Grant Medical Center for an examination. Laurie Miller, a staff nurse at the hospital, examined Poland and observed abrasions on her abdomen and on the sides and back of her neck.
 {¶ 16} Appellant testified on his own behalf and gave the following account of the events. According to appellant, Poland moved out of her apartment because her mother was ill, and he denied that anyone told him to leave the apartment. On the morning of November 13, 2002, appellant was sleeping in the apartment when he heard Poland removing hangers from a closet. Poland said she did not mean to wake him up, but appellant responded that he needed to talk to her. Poland came over to the bed, undressed and said, "[y]ou miss this, don't you?" (Tr. 222.) Appellant responded, "[n]o, not really." (Tr. 222.) Poland kissed appellant but he "didn't really respond to her because [he] was a little upset with her." (Tr. 222.) Appellant testified that they had sexual intercourse, but that he did not use any type of force.
 {¶ 17} Afterwards, Poland asked appellant what he wanted to talk about. He told her he was "trying to let you know that * * * I was with somebody else. There's somebody else that I have been seeing." (Tr. 225.) Poland became angry, and "started calling me names, [so] I told her, `[w]ell, I am going downstairs because I am not going to sit up here and listen to this.'" (Tr. 226.) As he walked out of the bedroom into the hallway, Poland "pushed me from the back." (Tr. 226.) Appellant "turned around and I said, `[n]ow, listen, I am not going to have you hitting on me or pushing on me like that.'" (Tr. 226.)
 {¶ 18} Poland called appellant "a bad name," and she grabbed his shirt and tried to hit him. (Tr. 226.) Appellant then grabbed her by the wrist and the waist, at which time Poland told Jaylen to call 911. Appellant told Jaylen he was "not hurting mommy. I'm trying to keep mommy from hitting me." (Tr. 228.) Jaylen turned around, went back to his room and sat down.
 {¶ 19} Eventually, appellant told Poland he was going to let her go. When he got ready to release his grip, Poland attempted to push him but he threw his hands up. Poland jerked away and appellant realized Poland was about to fall. Appellant testified, "I reached out, I caught her by her upper part of her right arm here, but the way she was slipping, it was like she was on her stomach. She was going down on her stomach." (Tr. 229.) Appellant fell down the steps with her.
 {¶ 20} Appellant then attempted to explain to Poland that he had told her he was seeing someone else because he wanted her to come back home. As they were talking, someone knocked on the door, and appellant "automatically knew that it was the police." (Tr. 233.) Appellant had not reported to his parole officer in the last two years, and he told Poland he was not going to answer the door. According to appellant, Poland responded, "[w]ell, maybe they'll go away." (Tr. 233.) When the officer asked why he would not answer the door, appellant said, "[w]ell, I'm not going to go answer the door. * * * We don't have a problem here." (Tr. 236.)
 {¶ 21} Appellant acknowledged taking a coat hanger and putting it in his shirt, but eventually he dropped the hanger because he was "tired," telling Poland he was "going upstairs." (Tr. 240.) Poland followed him upstairs. Appellant subsequently spoke on the phone with a hostage negotiator. Appellant told the officer he was not holding anyone hostage, but that he was not coming out because he had a parole violation. According to appellant, he asked Poland if she was going to go out of the apartment, and Poland responded, "I'm not coming out until you come out." (Tr. 243.) Appellant testified that he has high blood pressure, and "[w]hen I laid my head down, I don't know if I just went all the way to sleep or passed completely out, but I know I was unconscious." (Tr. 245.)
 {¶ 22} Appellant testified that he eventually told Poland that he wanted her and Jaylen to leave. Appellant remained in the apartment, and the hostage negotiator called and asked him if he was coming out. Appellant told the negotiator he would be out in a little while. Appellant went back upstairs to the bedroom. He stated that, while he was lying on the bed, he lost consciousness again and when he awoke the officers were in the apartment.
 {¶ 23} The state called Detective Moledor as a rebuttal witness. During his rebuttal testimony, the state played for the jury the November 13, 2002 interview Detective Moledor conducted with appellant. During the interview, appellant told the detective, "it wasn't really no hostage situation until later on" and that he "would have let her go earlier." (Tr. 305-306.) Appellant also told the detective that the only reason Poland was upset was because, while she was away in Zanesville, he left Jaylen alone in the house until 3:00 or 4:00 a.m.
 {¶ 24} Following deliberations, the jury returned verdicts finding appellant guilty of attempted rape, kidnapping and abduction. The trial court sentenced appellant by judgment entry filed on April 16, 2004.
 {¶ 25} On appeal, appellant sets forth the following assignment of error for review:
The trial court erred when it entered judgment against the defendant when the evidence was insufficient to sustain a conviction and was not supported by the manifest weight of the evidence.
 {¶ 26} Under his single assignment of error, appellant contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.
 {¶ 27} Sufficiency of the evidence and weight of the evidence are distinct legal concepts. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. In State v. Sexton, Franklin App. No. 01AP-398, 2002-Ohio-3617, at ¶ 30-31, this court discussed those distinctions as follows:
To reverse a conviction because of insufficient evidence, we must determine as a matter of law, after viewing the evidence in a light most favorable to the prosecution, that a rational trier of fact could not have found the essential elements of the crime proved beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. Sufficiency is a test of adequacy, a question of law. State v. Thompkins (1997), 78 Ohio St.3d 380, 386,678 N.E.2d 541, citing State v. Robinson (1955), 162 Ohio St. 486,124 N.E.2d 148. We will not disturb a jury's verdict unless we find that reasonable minds could not reach the conclusion the jury reached as the trier of fact. Jenks, supra, at 273, 574 N.E.2d 492. We will neither resolve evidentiary conflicts in the defendant's favor nor substitute our assessment of the credibility of the witnesses for the assessment made by the jury. State v. Willard (2001), 144 Ohio App.3d 767, 777-778,761 N.E.2d 688; citing State v. Millow (2001), Hamilton App. No. C-000524. A conviction based upon legally insufficient evidence amounts to a denial of due process, Thompkins, supra, at 386, 678 N.E.2d 541, citing Tibbs v. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211,72 L.Ed.2d 652; and if we sustain appellant's insufficient evidence claim, the state will be barred from retrying appellant. Willard, supra, at 777, 761 N.E.2d 688, citing State v. Freeman (2000),138 Ohio App.3d 408, 424, 741 N.E.2d 566.
A manifest weight argument, by contrast, requires us to engage in a limited weighing of the evidence to determine whether there is enough competent, credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction. State v. Brooks (2001), Franklin App. No. 00AP-1440, at 21, citing Thompkins, supra, at 387, 678 N.E.2d 541. Issues of witness credibility and concerning the weight to attach to specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those determinations is superior to that of a reviewing court. State v. Bezak (1998), Summit App. No. C.A. 18533, at 7-8, citing State v. DeHass (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. Nonetheless, we must review the entire record. With caution and deference to the role of the trier of fact, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury, as the trier of facts, clearly lost its way, thereby creating such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. Id., at 5-6, 227 N.E.2d 212, citingThompkins, supra, at 387, 678 N.E.2d 541.
 {¶ 28} As noted, appellant was convicted of kidnapping, abduction and attempted rape. R.C. 2905.01 sets forth the elements of kidnapping, and states in relevant part:
(A) No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
* * *
(3) To terrorize, or to inflict serious physical harm on the victim or another;
(4) To engage in sexual activity, as defined in section 2907.01
of the Revised Code, with the victim against the victim's will[.]
 {¶ 29} In order to convict appellant of abduction, the state was required to prove that appellant, "without privilege to do so * * * knowingly * * * [b]y force or threat, remove[d] another from the place where the other person is found" or "by force or threat, restrain[ed] the liberty of another person, under circumstances which create a risk of physical harm to the victim, or place the other person in fear[.]" R.C.2905.02(A)(1) and (2).
 {¶ 30} The Ohio Supreme Court has held that attempted rape requires that a defendant: (1) intend to compel submission to sexual conduct by force or threat; and (2) commit some act that convincingly demonstrates such intent. State v. Davis (1996), 76 Ohio St.3d 107, 114.
 {¶ 31} We first consider appellant's sufficiency argument. In challenging the sufficiency of the evidence, appellant primarily attacks the credibility of Poland's testimony. However, this court has previously noted that whether evidence is legally sufficient "is a question of law, not fact," and, therefore, "in determining the sufficiency of the evidence, this court must give `full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" State v. Turner, Franklin App. No. 04AP-364, 2004-Ohio-6609, at ¶ 13, quoting Jackson v. Virginia (1979), 443 U.S. 307, 319. Accordingly, "the credibility of the witnesses is an issue primarily determined by the trier of fact." Turner, supra.
 {¶ 32} Here, construing the evidence most strongly in favor of the state, there was evidence that appellant ordered Poland and Jaylen upstairs, telling Poland that "nobody was going to be walking out, that he would kill both of us before anybody would be released." (Tr. 140.) When Poland told Jaylen to leave and get help, appellant pushed the boy back into his room. Jaylen testified that he remained in the apartment because "[t]here was no way I could get out." (Tr. 106.) Appellant then began choking Poland; he tried to push her into the bedroom but she managed to get out of the headlock. Appellant, however, grabbed her again, and they both fell down the stairs, where he resumed choking her, and telling her that she was going to die. Both Poland and Jaylen testified that they were frightened by the actions of appellant. Later, in the upstairs bedroom, Poland observed appellant with a knife, and she thought "eventually he's just going to kill me, he's not going to let me out of here." (Tr. 149-150.) Appellant then ordered Poland to remove her clothing and lay down; he attempted to have sex with her, but was unable to penetrate and quickly ejaculated.
 {¶ 33} Upon review, we find that the state presented sufficient evidence to prove the elements of kidnapping, abduction and attempted rape beyond a reasonable doubt. See State v. Wingfield (Mar. 7, 1996), Cuyahoga App. No. 69229 (defendant's acts of grabbing victim, dragging her through apartment, knocking her to ground and choking her sufficient evidence to meet elements of kidnapping; defendant restrained liberty of victim and exerted force in dragging and choking her, and act of choking showed intent to terrorize); State v. Rollins (July 19, 1991), Fulton App. No. F-88-11 (jury could find defendant guilty of one count of abduction when victim was removed from bedroom to living room, and of a second count of abduction when victim, who testified he did not believe he was free to leave, was restrained in living room).
 {¶ 34} Appellant's manifest weight argument similarly challenges the credibility of Poland. However, when there is conflicting testimony, the trier of fact is free to believe "all, part, or none of the testimony of any witness who testified, including appellant." State v. Berry, Butler App. No. CA2003-02-053, 2004-Ohio-6027, at ¶ 12, citing State v. Antill
(1964), 176 Ohio St. 61, 67. Further, a criminal defendant "is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." State v. Smith, Franklin App. No. 04AP-726, 2005-Ohio-1765, at ¶ 27. Nor does the fact that the trial court dismissed some of the charges, based upon the evidence presented, militate against a finding of guilt as to the guilty verdicts. Here, the trier of fact was in the best position to determine the credibility of the testimony presented, and we decline to substitute our judgment for that of the jury. Rather, we find that the jury did not lose its way by choosing to believe the version of events presented by the state's witnesses, and we conclude that the convictions are not against the manifest weight of the evidence.
 {¶ 35} Based upon the foregoing, appellant's single assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
Klatt and Sadler, JJ., concur.