OPINION
Shortly after midnight on June 17, 2000, four-year-old Christine Grennell, two-year-old Christopher Grennell, and eleven-month-old Cassie Grennell died in a fire at the home they shared with their parents, Cynthia Campbell and Christopher Brian Grennell. The home, a two-story half-double, was located at 107 Woodrow Avenue, Columbus, Ohio. Both parents survived the fire. The mother suffered burns before exiting the house through a second-story window and jumping from the front porch roof.
Grennell and Campbell were home that evening with their three children. Following a disagreement, Campbell retired to the upstairs front bedroom where the whole family normally slept. Campbell's older son, John Campbell, usually occupied the rear bedroom, but was not present that night. Until a few days prior to the fire, Grennell's sister, Amy, and her boyfriend, Timothy New, also occupied the back bedroom.
Grennell was downstairs with the children who fell asleep between 10:00 and 11:00 p.m. He took each one upstairs, putting the two older ones in bed with their mother and placing the baby in her own small bed. The father returned downstairs, fixed himself something to eat, and watched television in the front room. It was raining outside, so he lowered the front window, but left it open enough to permit a breeze. At about 12:30 a.m., an object came through the partially open window, bounced off the arm of a couch located beneath the window, and came to rest on the windowsill. The object emitted sparks, spun around and sounded two or three loud booms. It appeared to extinguish, but left charring on the windowsill. Grennell said he opened the front door to let smoke out and stepped onto the front porch. He saw a taxicab backing up in front of the house. The cab driver asked him if he was okay and if he had seen "the kid" who had thrown the object at the house. Grennell saw no one on the street except the cab driver. Although dressed only in his shorts, a hat and glasses, he closed the front door and got into the back seat of the cab to look for the perpetrator. The driver turned right from Woodrow to Fourth Street having seen the person who threw the object go in that direction. After searching through the immediate area, the cab went back down Fourth toward Woodrow. From near that intersection, Grennell saw flames coming out of the first floor window of his home, so he jumped out of the cab and ran towards the house. Grennell stated that he tried to open the front door, but the flames and heat pushed him back. He called for help and yelled for his girlfriend to get the children out of the house. He noticed a police cruiser pull up in front of the house. After asking the officer to help him, Grennell said he ran to the rear of the house, but failed to gain entry. Returning to the front, he saw Campbell jump from the porch roof. A crowd gathered and firefighting equipment arrived. On cross-examination, Grennell acknowledged that, while the fire fighters were attempting to extinguish the fire, he ran to the home of Campbell's daughter, April, located on Innis Avenue, one street south of Woodrow, to bring her back to the scene.
The police officer first on the scene testified that he was patrolling west on Woodrow when he noticed the fire in progress. As he approached the burning house, a man dressed only in shorts, later identified to him as Grennell, ran towards the cruiser shouting that his kids were in the house. The officer exited his cruiser and radioed for firefighting equipment and a medic. He described Grennell as hysterical. The officer testified about his attempts to enter the dwelling, without success, because the heat from the fire was too intense. He eventually was able to enter the building through the rear door of the adjoining side of the double and evacuated that unit. He then assisted with crowd control while the fire fighters who had arrived at the scene worked the fire.
By the time the first fire truck arrived, the house was fully ablaze. Fire personnel described their efforts to control the fire, their search for victims and the removal of the children's bodies from the house. Larry Tate of the Franklin County Coroner's Office testified that the cause of death for each of the children was smoke inhalation and, thus, carbon monoxide poisoning.
Billy Reedus, a fire inspector with the Columbus Division of Fire who was qualified as an expert witness in arson investigation without objection, related his observations and findings. Upon his arriving at the scene, the fire was under control, although the fire fighters were still working to put out hot spots. Generally, Reedus described an older frame home with shingle siding and explained that, because of the dryness of the wood in such a dwelling, a fire will spread rapidly once it has started. Pointing out that a fire will track out and up from its place of origin and follow a path of least resistance, he noted that this fire burned from front to back on the first floor, then up to the second floor via the stairwell located off the kitchen. Reedus also explained that ventilation through open windows allowed this fire to track up the outer walls of the dwelling to reach the second story more quickly. The burning from both inside and outside made the heat and flame in the upstairs bedrooms more intense. After pin-pointing the origin of this fire as being the north wall of 107 Woodrow "just below the front room window" [Tr. 474], the inspector concluded:
 I determined that the fire originated in the living room area along the north wall. There was no accidental cause for the fire to start. Once I had left the scene I made a determination this was an incendiary fire, that it was purposely started * * *. [Tr. 488.]
Reedus testified that he did not notice any pour pattern near the point of origin and that he saw no reason to collect samples of the living room carpet.
Another expert called by the prosecution was Dave Schroeder, State Fire Marshall Administrator for Explosives and Pyrotechnics. He qualified as an expert in the area of fireworks. Schroeder identified fireworks he had obtained from his department's inventory of seized fireworks that matched the prosecutor's request for "a pear-shaped device, anywhere from your fist up * * * that would be used in a fireworks display, or * * * that someone could get access to." [Tr. 448-450.] He described the characteristics of those exhibits and explained differing classifications that determine whether the item is available for sale to consumers. He said that the bottom part of the pear-shaped firework is a lift charge that causes the device to be propelled in a direction. The top portion contains additional pyrotechnics that will be ignited by an internal fuse following a slight delay as the lift charge is extinguishing. This second phase is called a report and will produce either stars (sparkles) or booms, depending on how the firework is manufactured. These fireworks are designed to be shot out of a tube, referred to as a gun in the industry, so as to aid in controlling their direction of flight.
Rex Dalton, the cab driver, testified that he was on Woodrow Avenue, traveling from Parsons Avenue to High Street, on the way to pick up a fare. It was dark and raining. Between Fifth and Fourth Streets he saw a "younger person on a bicycle * * * kind of hunched over * * * his hands up in front of him." [Tr. 378.] Dalton slowed his vehicle and, as he passed, observed that person take a round object, smaller than softball size, from under his jacket, lean back and throw it "over-handed, very hard, like * * * a baseball pitcher" towards the house at 107 Woodrow. [Tr. 381.] Dalton described the bicycle as a smaller-wheeled custom bike. The person on the bicycle was dressed in a larger style camouflage army fatigue jacket and fisherman-like floppy hat. The cab driver then heard a loud bang and saw a bright silver and blue flash coming from the front window area of 107 Woodrow Avenue. He backed up towards the house and saw the perpetrator again. The person on the bicycle was six-to-seven feet away, outside the passenger-side window of the cab. Dalton testified that they stared at one another for five-to-seven seconds. Dalton continued to back up in front of the house where he had seen the flash. He saw the person on the bicycle turn right onto Fourth Street. In front of 107 Woodrow, Grennell got into the backseat of the cab and they circled the neighborhood looking for the perpetrator without success. Grennell exited the cab as they returned to near Fourth and Woodrow when he saw flames coming from his house. Dalton continued on to find a phone and to pick up his fare.
Dalton contacted the police department the next day after learning that children had perished in the fire. He provided a description of the perpetrator as being a youthful, clean-shaven white male, about 150 pounds with a darker complexion and dark hair coming out from beneath his cap. That evening, he went to police headquarters and, on tape, was shown a photo array consisting of photos of six young caucasian males. Appellant's photograph was number six. Dalton examined the array and, contrary to instructions not to comment until certain, expressed that photograph number four looked like the perpetrator, but he did not think it was the same person. The detective concluded the taped session when Dalton made the comment. Sensing the detective's disappointment, Dalton asked, "It isn't number four, is it?" [Tr. 398.] When told no, he volunteered "I'm a hundred percent sure it's number six." [Tr. 398.] While the detective did not consider this array to be useful in court as a positive identification, he described the procedure in his summary. The array of six photos was admitted into evidence for the jury's consideration.
Appellant first became a suspect in the death of the Grennell children when Columbus Police Department personnel at the fire scene received information that a person named Mitchell who lived at a specified address on East Morrill Avenue was observed shooting off fireworks in the neighborhood earlier in the day on June 16, 2000, and may have been involved in starting the fire. After clearing the fire scene, the detectives went directly to that address to attempt to interview appellant, but the suspect's mother or brother, both of whom were present, told them that Mitchell was not home. Later that day, June 17, appellant's mother called the detectives and they returned to the home to talk to appellant. Appellant denied involvement, but permitted the detectives to photograph him for purposes of the photo array.
The same evening, the detectives interviewed Tina Brown, a prosecution witness who lived down the street from appellant and claimed she knew him from occasions when he came to her house with her children and her niece and nephew, who also resided with her. They likewise interviewed the nephew, Daniel Scott, and niece, Felicia Gillespie. Based in large part upon information obtained from those witnesses, a warrant was obtained for appellant's arrest. The detectives returned to the residence where appellant lived and took him into custody that same evening. At the police department, with his mother present, detectives conducted a videotaped interrogation of appellant.
At trial, the tape was introduced into evidence and played for the jury. Early in the interview, appellant said he shot off some fireworks earlier in the day on June 16, 2000, but he denied being on Woodrow, having anything to do with the fire, or knowing who caused it. He described the fireworks he had as little bottle rockets. He had bought them from a man who sold fireworks in the neighborhood from his car. Later in the interview, one of the detectives suggested "you need to say what's on your mind and tell us the truth. It will work out better for you, work out better for us. * * * We are just trying to explain to you if this were an accident, just tell us, you're better off to tell us now what occurred that night." [Tr. of Tapes, p. 70.] Appellant, crying, then acknowledged being on Woodrow, lighting a bottle rocket and throwing it up in the air. Giving mostly "yes" and "no" responses to the detective's questioning, appellant indicated he thought the house was empty and there were no lights on. He said the window was open. Appellant indicated he threw the bottle rocket up in the air, but it slipped and went towards the house. He thought it landed on the porch. Appellant showed the detectives burn blisters on his hand. He acknowledged he was by himself and was riding a chrome bike from his grandpa's house on Innis Avenue on the way home. He stopped on Woodrow to light the firecracker and threw it up in the air. He repeated, "I didn't do it on purpose." [Tr. of Tapes, p. 87.]
Tina Brown testified concerning the information she gave to the detectives the night after the fatal fire. She said that, the previous evening around midnight, appellant came down the street on a bicycle that looked like a motorcycle, stopped in front of the house and asked for her nephew, Daniel Scott. She described appellant as wearing a camouflage jacket and fishing hat she recognized as being one given to him by her boyfriend because it matched the jacket. She examined the exhibits identified by the fireworks expert and related that appellant was showing similar, but slightly smaller fireworks to her niece, Felicia, and another niece, Janet Jones, who was there that night. Ms. Brown also said she overheard appellant trying to get her nephew, Daniel, to go with him over to Woodrow Avenue to "burn up or blow somebody's house." [Tr. 139.] She testified that appellant was still at her house when she left for Wendy's for food, a 15-to-20 minute trip, and that she heard the emergency vehicles over on Woodrow when she returned.
Daniel Scott also testified as a prosecution witness concerning his contact with appellant shortly before the fire. Felicia Gillespie was called by the defense. Their testimony of the details as to what appellant was wearing when he appeared at their house and their description of the bicycle he was riding and the pear-shaped fireworks he showed them was similar to testimony by Tina Brown. Scott said the firework appellant had was a little bit bigger than a sample shown him from among those identified by the state's fireworks expert. Gillespie looked at two of the exhibits and said the firework that appellant showed her was in between the sizes of those exhibits. Scott also related what appellant said he wanted to do when he asked Scott to go with him to Woodrow.
Appellant's 17-year-old uncle, Christopher Legg, testified that he spent much of June 16, 2000, from mid-afternoon on at appellant's home on Morrill Avenue. He had a close relationship with appellant's older brother, Donald McCandlish, who also resided there. Legg testified that appellant looked up to his older brother and always wanted to be involved in everything Donny was involved in. He also testified that, around 3:00 p.m., he was with appellant and his brother when Donny bought some fireworks from someone in a gray car. Legg said Donny bought mostly small bottle rockets and Roman candles, but that he also purchased a box of several larger fireworks, round masses with a tube "like the fireworks from Red, White and Boom." [Tr. 167.] He was buying for himself and for the neighborhood kids.
When they all returned to the house on Morrill, Donny was talking about having been ripped off the night before in a drug purchase for $500 by some people who lived near Sixth Street and Woodrow. Donny was upset about losing the money and talked about firebombing those people's house. Appellant got excited and allegedly said he would take care of it for his brother. Donny ignored him. Legg went to his own house on Innis Avenue, then returned to appellant's house at about 7:00 p.m. He said that Donny, appellant and another cousin named Cory were making Molotov cocktails. Legg denied helping them, although a defense witness, Christina Haskett, Donny's fiancé, later testified that Legg made the Molotov cocktails and that appellant was not around at the time. A neighbor across the street from appellant's house, Rachel Clark, said that Legg came to her house to borrow lighter fluid, although her mother, Brenda Backus, remembered that appellant was the person who asked for the lighter fluid.
Legg testified that he was out on the front porch about midnight, when appellant came out holding one of the larger round fireworks, but he did not have the launching tube for it. He told Legg he was going to throw it at the house near Sixth and Woodrow. Shown two of the devices identified by the state's fireworks expert, Legg said the size of the one appellant had fell between the sizes of the samples. Legg testified that appellant was dressed in a camouflage army coat and matching hat. He also related that a woman who knew Donny came over on a bicycle with plastic on the sides made to look like a Harley-Davidson motorcycle. She went inside the house because she wanted to sell the bicycle to Donny. According to Legg, appellant got on the bicycle and left, heading south in an alley towards Woodrow. He said appellant was gone about ten minutes, then returned and was "real hyper, jumpy * * * real excited." [Tr. 180-181.] Legg said that, right after appellant arrived home, he noticed smoke coming from the direction of Woodrow Avenue.
The remainder of Legg's testimony primarily concerned events that occurred after the fire, including an incident at Tina Brown's house in which he threw a brick through a car window and was ultimately found to be delinquent on the charge of intimidating a witness, either Brown or her daughter Felicia, in relation to their anticipated testimony in this case. He was committed to the Department of Youth Services and released the day before his own testimony. Legg also talked about his own relationship with the family that lived at 107 Woodrow. He said he spent a lot of time at that house and was close to the deceased four-year-old, Christine. Cynthia Campbell also testified about Legg being special to the child. Legg said he was a friend of Timothy New and told about the theft of a car stereo from New's car. He indicated that appellant had been accused of that theft, implying that tension existed between the two. New, called as a witness later in the trial by the defense, denied any such bad blood.
The defense presented testimony from neighbors on Woodrow Avenue tending to show that Brian Grennell and Cynthia Campbell quarreled frequently. A taped telephone conversation between the two, recorded after Campbell had been released from the hospital, was introduced into evidence. That conversation was an angry exchange concerning the disposition of funds donated to the family for the children's funeral and other issues.
The occupant of the adjoining half-double, Rudy Perez, described the argument between Campbell and Grennell the night of the fire as well as an incident when Grennell spanked one of his daughters. Before the fire, Perez heard a big bang, then two minutes later heard Campbell screaming "fire, fire." He tried to get a ladder to help, but the flames were too hot. Perez testified that he did not notice Grennell in the area until he observed him walking westbound on Woodrow after the victims had been removed from the dwelling. Perez related that Campbell's son, John, kept a gas can near the back door because he worked on lawnmowers. He identified a picture of the gas can and said it was empty after the fire. Perez also said that the family next door often grilled food on the front porch and one time started a fire that John Campbell put out. Perez stated that the dwelling had burned once before, four years previously.
Geneva Holschuh, who lived two houses away from Grennell and Campbell on the same side of the street, testified that she heard a loud boom. She looked out her own front window, saw the taxi-cab and watched Brian Grennell, dressed in what she described as his boxer shorts, get into the cab. She did not see anyone on a bicycle. Several minutes later, Ms. Holschuh heard a woman calling for help and went out on her front porch. At that point in time, 107 Woodrow was engulfed in flames. The neighbor then saw Grennell running towards the burning house from the direction of Fourth Street. She recalled that he was dressed at the time. She did not see him approach the house or try to get back inside. She testified that she later told investigators for both the prosecution and defense that she thought the father was responsible for the fire because he left the house and, upon his return, she did not see him try to save his family.
Another neighbor, Lowell Brown, who lived directly across the street, testified that he saw two men at 107 Woodrow at about 12:15 a.m. on June 17, 2000. He did not know either person and said he did not know Brian Grennell. From his second-story bathroom, he heard someone shout "fire." He testified that he went to the window after a minute or so and he described watching the fire across the street. It was small at first, starting inside the first-floor front window. Brown said the flames followed a straight line across the living room into the kitchen area, then "shot up like somebody poured gas over all, and went straight up the stairway." [Tr. 728.] On the day after the fatal fire, Mr. Brown followed an investigator whom he could not identify into the burned dwelling. When the other man left, Brown removed some carpeting from the living room floor beneath the sofa. He testified that the carpet was still wet and that some of it was soaked with oil. He insisted that the substance was oil and not gasoline. Brown, who testified that he is a private investigator, having attended two years of private investigator school, told about how he lit some of the samples and that the portions with liquid on them burned quickly, but the others did not. He indicated he did the experiments to prove that "no firecracker would set that fire." [Tr. 749.] He said he gave some samples of carpet to detectives whom he was likewise unable to identify, some to the trial prosecutor and some to private investigators. He also kept some in his garage, but the garage was torn down and the samples discarded following an accidental fire that destroyed his own home and caused his wife's death months after the fire at 107 Woodrow, but before the trial in this case. Mr. Brown said he never heard back from any of the people to whom he had given carpet samples, so he did not know what was done with them.
The defense also called Jack Haller, a property manager and contractor who often employed Cynthia Campbell's brother, Tim Murray, as a subcontractor. Haller said he also did some private investigating work, although he was not licensed. At Tim Murray's request, he went to the fire scene about noon on the day after the fire and entered the scene after talking to the next-door neighbor, Rudy. He described the living room carpet as being badly burned in the middle and back of the room, but it still looked like carpet towards the back. He smelled a gasoline-like odor on the carpet and tore off a piece of it. He gave the carpet sample to a private investigating agency he had recommended that the Murray family engage in connection with the fatal fire. Haller testified that he thought the agency was no longer involved in the case and he had not seen the carpet samples since he turned them over. Haller also testified that he felt, from his observations, that there was a burn pattern along the floor and up the stairs.
Appellant was charged in connection with the fire and deaths in an 11-count indictment.[1] Counts 1 through 3 of the indictment alleged that he committed felony murder with respect to each victim, in violation of R.C. 2903.02, by causing the death of each as a proximate result of his committing or attempting to commit aggravated arson, an offense of violence that is a felony of the first or second degree. Appellant was charged with aggravated arson, in violation of R.C. 2909.02, in Count 4 of the indictment on the allegation that he knowingly created a substantial risk of serious physical harm to any person other than himself by means of fire or explosion. Count 5 charged him with aggravated arson in violation of R.C. 2909.02 as well, but was based upon the allegation that he knowingly caused physical harm to an occupied structure by means of fire or explosion. In Count 6 of the indictment, appellant was alleged to have committed felonious assault in violation of R.C. 2903.11, in that he knowingly caused serious physical harm to Cynthia Campbell. Appellant was charged with involuntary manslaughter in Counts 7 through 9 of the indictment, in violation of R.C. 2903.04, based upon allegations that the death of each victim was a proximate result of his committing or attempting to commit a violation of restrictions on possession, sale and use of fireworks, a misdemeanor offense under the provisions of R.C. 3743.99(C). Count 10, charging him with that misdemeanor, alleged that he recklessly discharged, ignited or exploded a firework in violation of R.C. 3743.65. Counts 1 through 10 of the indictment all pertained to the incident of June 17, 2000.
Count 11 of the indictment involved an unrelated burglary charge alleged to have been committed by appellant on May 1, 2000. The trial court ordered Count 11 to be severed from the others prior to commencing a jury trial on Counts 1 through 10.
Following a seven-day trial and after two days of deliberation, a jury returned guilty verdicts on three counts of felony murder (Counts 1 through 3), three counts of involuntary manslaughter (Counts 7 through 9), one count of aggravated arson (Count 5), and one count of illegal discharge of fireworks (Count 10). The jury rendered not guilty verdicts on one count of aggravated arson (Count 4) and on the felonious assault charge (Count 6).
On March 2, 2001, the trial court sentenced appellant to serve terms of imprisonment of 15 years to life on each of the felony murder convictions and ordered those terms to be served consecutively. The three involuntary manslaughter convictions were merged, consistent with an election by the prosecutor, with the murder convictions for sentencing purposes. On the aggravated arson conviction, the court ordered appellant to serve a definite term of eight years, with that sentence to run concurrently with the felony murder sentences. The court imposed a six-month sentence on the misdemeanor fireworks conviction and suspended it for time served. After having been sentenced on these verdicts, appellant entered a guilty plea on March 8, 2001, with respect to the severed Count 11 to a reduced charge of attempted burglary, and the court sentenced him to a three-year term on that conviction, also to be served concurrently with the murder sentences.
The trial court journalized its judgment, including these sentencing orders, in an entry filed March 12, 2001. Appellant appeals from that judgment and presents the following assignments of error for this court's consideration:
First Assignment of Error:
 The trial court committed reversible error by providing an incomplete and erroneous instruction to the jury.
Second Assignment of Error:
 Appellant was deprived of the fair trial guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Section 10, Article I
of the Ohio Constitution by the prosecution's use of irrelevant and inflammatory evidence.
Third Assignment of Error:
 The State violated Appellant's right to due process by failing to preserve materially exculpatory evidence.
Fourth Assignment of Error:
 Appellant was denied effective assistance of counsel by the failures of his trial counsel.
Fifth Assignment of Error:
 The judgment of the trial court was not supported by sufficient evidence.
Sixth Assignment of Error:
 The trial court committed reversible error and deprived Appellant of due process of law by entering judgment of conviction that was contrary to the manifest weight of the evidence.
Seventh Assignment of Error:
 The trial court erred in ordering sentences to be served consecutively in the absence of any evidence in the record of any of the factors enumerated in R.C. 2929.14(E).
We will consider assignments of error five and six together because they are interrelated. We will discuss them first and then will address the remaining assignments of error in the order presented by appellant.
In assignments of error five and six, appellant asks us to reverse his convictions on the grounds that they were not supported by sufficient evidence as a matter of law, and that the judgments of conviction were against the manifest weight of the evidence.
To reverse a conviction because of insufficient evidence, we must determine as a matter of law, after viewing the evidence in a light most favorable to the prosecution, that a rational trier of fact could not have found the essential elements of the crime proved beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Sufficiency is a test of adequacy, a question of law. State v. Thompkins (1997), 78 Ohio St.3d 380, 386, citing State v. Robinson (1955), 162 Ohio St. 486. We will not disturb a jury's verdict unless we find that reasonable minds could not reach the conclusion the jury reached as the trier of fact. Jenks, supra, at 273. We will neither resolve evidentiary conflicts in the defendant's favor nor substitute our assessment of the credibility of the witnesses for the assessment made by the jury. State v. Willard (2001), 144 Ohio App.3d 767, 777-778; citing State v. Millow (2001), Hamilton App. No. C-000524. A conviction based upon legally insufficient evidence amounts to a denial of due process, Thompkins, supra, at 386, citing Tibbs v. Florida (1982), 457 U.S. 31,45; and if we sustain appellant's insufficient evidence claim, the state will be barred from retrying appellant. Willard, supra, at 777, citingState v. Freeman (2000), 138 Ohio App.3d 408, 424.
A manifest weight argument, by contrast, requires us to engage in a limited weighing of the evidence to determine whether there is enough competent, credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction. State v. Brooks (2001), Franklin App. No. 00AP-1440, at 21, citing Thompkins, supra, at 387. Issues of witness credibility and concerning the weight to attach to specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those determinations is superior to that of a reviewing court. State v. Bezak (1998), Summit App. No. C.A. 18533, at 7-8, citing State v. DeHass (1967), 10 Ohio St.2d 230, 231. Nonetheless, we must review the entire record. With caution and deference to the role of the trier of fact, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury, as the trier of facts, clearly lost its way, thereby creating such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. Id., at 5-6, citing Thompkins, supra, at 387.
Appellant contends that the evidence of record fails under either standard to establish "who caused the fire, why they caused it, and how it became a deadly inferno." He argues basically that the prosecution failed to present identification testimony of such quality as to sustain his convictions or to overcome proof presented by the defense that someone other than appellant committed the crimes. In addition, appellant asserts that the prosecution failed to prove to the requisite degree either what type of device caused the fire, or that a device, with characteristics such as would render these tragic results reasonably foreseeable, ignited the fire.
Arguing that the evidence was insufficient to establish that he committed the acts that caused the fire, appellant emphasizes discrepancies between his appearance and the description of the perpetrator originally communicated to the police by the prosecution's eyewitness, the cab driver Rex Dalton. Appellant also suggests that Dalton's uncertainty, when presented with a photo array that included appellant's photograph, taints the witness' in-court identification.
Dalton's testimony was not the only evidence that implicated appellant as being responsible for the fire at 107 Woodrow. Other witnesses testified that appellant was dressed in a camouflage jacket and fishing hat and was riding a small, custom bicycle near the time of the fire. That description matches what Dalton told to the police and related from the witness stand. Testimony concerning appellant's statements and actions shortly before and immediately after the fire was also evidence from which a reasonable inference could be drawn that he was involved in causing it. The jury had before it in addition the post-arrest interrogation tape in which appellant ultimately acknowledged being in front of 107 Woodrow and throwing a firecracker up in the air that he claimed accidentally landed on the front porch of that dwelling. There was sufficient evidence as a matter of law, when that evidence is viewed most favorably to the prosecution, for a rational trier of fact to conclude, beyond a reasonable doubt, that appellant was the person who committed the acts that resulted in the deaths of the Grennell children. Moreover, we find that there is enough competent, credible evidence that identifies appellant as the responsible actor so as to permit reasonable minds to conclude, beyond a reasonable doubt, that appellant caused the fire. While there was some testimony in the record that tended to implicate other individuals as bearing responsibility, we do not find that the jury, as trier of fact, lost its way as it resolved conflicts in the evidence relating to identification.
In addition, appellant contends that the prosecution never clearly proved what the object was that was thrown at the house and did not prove why it was done. From our review of the entire record, we disagree. The prosecution did present evidence from which a rational trier of fact could conclude, beyond a reasonable doubt, that the fire was caused by a firework thrown into the dwelling. Multiple witnesses described a firework in appellant's possession shortly before the fatal fire as being similar to those identified by Dave Schroeder of the State Fire Marshall's office. Schroeder, in turn, described the incendiary properties of those devices. Billy Reedus, the prosecution's arson investigation expert, concluded that the cause was of an incendiary nature, purposely started. In reaching that conclusion, he excluded mechanical and other accidental causes. We conclude that the evidence of how the fire started was sufficient as a matter of law. Also, even though the defense insisted that appellant only used small bottle rockets and presented some evidence consistent with that position, we cannot say that the jury's conclusion, after weighing the evidence in the record and the reasonable inferences to be drawn from it, was against the manifest weight of such evidence.
As to motive, the trial court cautioned the respective counsel throughout this trial that motive was not an element of any of the offenses with which appellant was charged. We agree with the trial court in that regard. The considerable testimony relating to conflicts and biases among the witness called by both parties may have been appropriate for the jury to consider in relation to the credibility of each witness and weight to attach to his or her testimony, but the prosecution was not required to prove beyond a reasonable doubt why appellant threw the firecracker at the Campbell-Grennell home.
Appellant also asserts that a history of discord between the mother and father of the deceased children, together with testimony that Grennell did not really try to save his family during the fire, and the suggestion by defense witnesses that they found evidence of gasoline on the carpet inside the house, all point to the father being responsible for his children's deaths. This argument addresses the weight of the evidence and not its sufficiency. We do not conclude, based upon our own review, that the jury lost its way in choosing to discount this defense theory of the case. It was within the jury's province and, as discussed above, enough credible, competent evidence exists to support the jury's verdict according to the required standards.
The elements of felony murder charged under R.C. 2903.02(B) are: (1) cause; (2) the death of another; (3) as a proximate result of the offender's committing or attempting to commit; and (4) an offense of violence that is a felony of the first or second degree and that is not a violation of R.C. 2903.03 (voluntary manslaughter) or R.C. 2903.04
(involuntary manslaughter). Here, the underlying felony for which appellant was convicted is aggravated arson, in violation of R.C.2909.02(A)(2), a felony of the second degree. The elements of that offense are: (1) knowingly; (2) cause physical harm to an occupied structure; and (3) by means of fire or explosion. The culpable mental state required to support a murder conviction is the same as must be proved to support a conviction for the underlying offense, aggravated arson. State v. Hayden (2000), Lake App. No. 99-L-037, and State v. Dixon, Montgomery App. No. 18582, 2002-Ohio-541.
We likewise find that there was sufficient evidence presented to support the jury's conclusions that appellant acted knowingly and that he caused physical harm to an occupied structure in committing the aggravated arson offense. The description by the cab driver of appellant throwing an object towards the dwelling and of his motion in doing so leads to a reasonable inference that he acted knowingly. Testimony from several witnesses showed that appellant was not only aware that 107 Woodrow was someone's home, but also knew some of the people living there.
Finally, we conclude that the evidence presented, considered according to both the sufficiency and manifest weight standards, supported the jury's conclusion, beyond a reasonable doubt, that the three deaths were the proximate result of appellant's commission of the aggravated arson offense for which he was convicted. We reach a like conclusion that the evidence, under both standards, supported appellant's conviction of the misdemeanor fireworks offense.
For these reasons, appellant's fifth and sixth assignments of error are overruled.
In support of his first assignment of error, appellant contends that the trial court failed to properly instruct the jury concerning the elements of murder under R.C. 2903.02(B), as those elements are set forth above. Appellant argues that the court's instruction did not adequately advise the jury as to the meaning of the phrase "proximate result," contending that the concept of "foreseeability" must be specifically defined as is often done in negligence cases where the exercise of ordinary care is a central issue. See 1 Ohio Jury Instructions (2002) 127-128, Section 7.13.
Relative to causation, the trial court instructed:
 * * * Cause is an act or failure to act which in the natural and continuous sequence directly produces the death and without which it would not have occur. (sic) Cause occurs when the death is the natural and foreseeable result of an act or failure to act.
 A death is the result of an act or failure to act when it is produced directly by the act or failure to act in the normal and continuous sequence and would not have occurred without the act or failure to act. Result occurs when the death is naturally and foreseeably caused by the act or failure to act. [Tr. 1037.]
This instruction closely parallels the definition for "causation" referred to in 4 Ohio Jury Instructions (2002) 152-153, Section 503.02, pertaining to a felony murder offense in violation of R.C. 2903.02(B); and fully set forth in 4 Ohio Jury Instructions (2002) 64-65, Section 409.55, titled "Cause; natural consequences." See State v. Barron (1997), Greene App. No. 96 CA 94; and State v. Baksi (1999), Trumbull App. No. 98-T-0123. This instruction also draws from the definition of "proximate cause" provided by 1 Ohio Jury Instructions (2002) 171, Section 11.10.
Appellant acknowledges that no objection was offered at trial to the jury instruction provided by the court, and that no special instruction defining "foreseeability" was requested. As a general rule, the failure to object at trial or to request specific jury instructions waives all but plain error with respect to the jury instructions given. State v. Hartman (2001), 93 Ohio St.3d 274, 289. Appellant argues nonetheless that "foreseeability" is an element of the murder offenses for which he was convicted herein and the trial court's failure to specifically define the term constitutes structural error, not susceptible to waiver or to a plain error analysis.
The Supreme Court of the United States has found structural error, subject to automatic reversal, in only a limited class of cases, including: the complete denial of counsel; a biased trial judge; racial discrimination in the selection of the grand jury; the denial of self-representation at trial; and a defective reasonable doubt instruction. Neder v. United States (1999), 527 U.S. 1, 8 [specific citations omitted]. A jury instruction that omits an element of an offense differs markedly from the constitutional violations found by the court to defy harmless error review for the reason that the omission of an element from the jury instruction "does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." Id. at 9. In Barron, supra, at 9, the appellate court rejected the argument appellant makes in this case, stating:
 The failure of the trial court to elaborate on the word "foreseeable" is a far cry from failing to charge on an essential element of the offense, the only failure which would arguably amount to a structural defect that would render plain error analysis inappropriate. * * *
We concur that the failure by the trial court to specifically define "foreseeability" is not a structural error. Therefore, a plain error analysis is appropriate.
The test for noticing plain error is whether or not the outcome of the trial would clearly have been otherwise except for the error. State v. Stallings, 89 Ohio St.3d 280, 285, 2000-Ohio-164; and State v. Brust (2000), Franklin App. No. 99AP-509, at 9-10. "[N]otice of plain error is taken with utmost caution only under exceptional circumstances and only when necessary to prevent a manifest miscarriage of justice." State v. Hairston (2001), Franklin App. No. 01AP-252, at 13, quoting State v. Lumpkin (1990), Franklin App. No. 91AP-567.
In State v. Losey (1985), 23 Ohio App.3d 93, this court observed that, as used in R.C. 2903.04, the involuntary manslaughter statute, the term "`proximate result' bears a resemblance to the concept of `proximate cause' in that [a] defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct." Id. at 95, citing State v. Chambers (1977), 53 Ohio App.2d 266; see, also, State v. Lovelace (1999), 137 Ohio App.3d 206, 219-220. The causation language of the felony-murder statute, R.C. 2903.02(B), is the same as that chosen by the legislature in the involuntary manslaughter provisions, thus the same principles apply. Dixon, supra, at 16. Foreseeability is certainly a component of proximate cause, but, even in civil cases, it does not equate with probable cause. Mussivand v. David (1989), 45 Ohio St.3d 314,321. A specific definition for the term "foreseeable" is not required and, indeed, inclusion of such an instruction may cause confusion to the jury by implying a negligence standard rather than requiring the jury to find the correct culpable mental state, that is, the mental state that supports a conviction of the underlying offense of violence. See Statev. Burchfield (1993), 66 Ohio St.3d 261, 263.
The trial court's instructions as to causation in this case as a whole were sufficiently correct and clear to have permitted the jury to understand the relevant law as it applies to this case. Lovelace, supra, at 223. The instructions were neither erroneous nor prejudicial. The court's omission of a specific definition did not result in a manifest miscarriage of justice. Appellant's first assignment of error is, therefore, overruled.
In his second assignment of error, appellant complains that a statement by Detective Viduya of the Columbus Police Department, referring to appellant as "pretty much a troublemaker," was irrelevant, prejudicial and made with the intent to poison the jury's perception of appellant. [Tr. 521.] The statement by the detective was made during direct examination as part of the following sequence:
 Q. As a result of developing a suspect did you make attempts to contact Mitchell Sexton?
A. Yes, we did.
Q. Why don't you describe your first efforts.
 A. Our first efforts were about three or four hours after we arrived at the fire scene. Witnesses in that area indicated that an individual by the name of Mitchell lived at 124 East Morrill Avenue. He was possibly responsible for this homicide.
 Witnesses indicated that he was seen earlier shooting off these fireworks at houses, other people in the area, and he's pretty much a troublemaker. So we had his name right from the beginning, his first name, and then we had an address to go to. And after we cleared the fire scene we went directly to that address to see if we could talk to Mitchell.
Appellant argues that this information, as volunteered by the detective, constitutes inadmissible "other acts" testimony, introduced to prove appellant's bad character. Appellant contends that the probative value of the statement is outweighed by the prejudicial effect it may have on the jury. No objection or motion to strike was interposed by the defense, but we are asked to recognize plain error with respect to the statement being admitted.
Generally, evidence of one's character is not admissible to prove that he acted in conformity with that character on a particular occasion, unless such evidence is offered either by the accused, or by the prosecution to rebut character evidence offered by the accused. Evid.R. 404(A)(1). Also, evidence of other acts is not admissible to prove the character or a character trait of a person so as to show he acted in conformity with that character or trait. Evid.R. 404(B).
For the witness not to volunteer the statement concerning appellant would clearly have been preferable. However, we do not agree with appellant's characterization of this testimony. In context, it was background evidence explaining why authorities first attempted to contact appellant and was not presented to prove character. The statement was part of a narrative response by the witness, not testimony elicited by any specific question by the prosecutor. While the prosecution cannot augment evidence relevant to the question of criminal liability with additional testimony offered to support a theory that an accused is "a bad person — find [him] guilty," this is not a case where such an attempt took place. See State v. Flaherty (1992), 78 Ohio App.3d 718, 723.
Neither the prosecutor nor the defense attorney pursued the statement concerning appellant further during the examination of the detective or the questioning of any other witness. Neither counsel mentioned the testimony in closing argument. We find no reasonable possibility that the challenged testimony contributed to appellant's conviction. A finding of such reasonable possibility is required for us to reverse that conviction. See State v. Heath (1999), Franklin App. No. 99AP-56, at 22; citing State v. Cotton (1996), 113 Ohio App.3d 125, 133; and State v. Frazier, 73 Ohio St.3d 323, 341, 1995-Ohio-235. Appellant's second assignment of error is overruled.
By his third assignment of error, appellant asserts that he was deprived of due process for the reason that the prosecution failed to preserve carpet samples removed from the scene of the fire by defense witnesses, Lowell Brown and Jack Haller. Suppression by the prosecution of evidence requested by an accused that is favorable to him and is material to his guilt or punishment violates due process irrespective of the good or bad faith of the prosecution. Brady v. Maryland (1963),373 U.S. 83, 87. Similarly, due process requires that materially exculpatory evidence be preserved. California v. Trombetta (1984),467 U.S. 479. Where evidence destroyed or lost is only potentially exculpatory, the accused must prove that the prosecution's failure to preserve the evidence was the product of bad faith. State v. Beliveau, Franklin App. No. 01AP-211, at 16-17, 2001-Ohio-4112. Additionally, the accused must show that, had the potentially exculpatory evidence been disclosed or furnished to the defense, the result of the proceedings would, with reasonable probability, have been different. Brust, supra, at 13. A "reasonable probability" in this context means a probability sufficient to undermine confidence in the outcome of the trial. Id., citing State v. Johnston (1988), 39 Ohio St.3d 48. Furthermore, the prosecution has no constitutional duty to perform any particular tests on evidence in its possession to determine if it may be exculpatory. Id., citing Trombetta, supra.
Both Lowell Brown and Jack Haller claimed to have some private investigating experience, but were not qualified as expert witnesses. From Haller's testimony, as summarized above, there is no evidence that any official involved in the prosecution of this case ever had knowledge of or access to the carpet sample he removed from the burned premises. Therefore, we cannot conclude that the prosecution had the ability, let alone a duty, to preserve it, to test it, or to produce it. Brown's testimony as to whom he gave the samples he removed from 107 Woodrow Avenue was confusing, at best. Even if an official involved in prosecuting appellant possessed those carpet samples, there is no clear indication in the record that the samples, if tested, would have exonerated him. See State v. Jones (1998), Franklin App. No. 97APA08-1105, at 4-5. The carpet samples are, at most, potentially exculpatory. Appellant has not shown that any failure to preserve that evidence was due to bad faith on the part of the prosecution. Appellant's third assignment of error is overruled.
In his fourth assignment of error, appellant contends that he was denied effective assistance of counsel. Reversal of a conviction for ineffective assistance of counsel requires that appellant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive him of a fair trial. State v. Issa, 93 Ohio St.3d 49, 67, 2001-Ohio-1290, citing Strickland v. Washington (1984), 466 U.S. 668. To be deficient, counsel's performance at trial must have fallen below an objective standard of reasonable representation. State v. Goodwin (1999), 84 Ohio St.3d 331,335. In addition, one claiming that trial counsel's performance was deficient must show that he suffered prejudice as the result. Id. To establish prejudice, he must prove the existence of a reasonable probability that, but for counsel's errors, the outcome of the trial would have been different. Id., citing State v. Bradley (1989),42 Ohio St.3d 136, 142.
Appellant lists four areas in which he asks us to find that he was deprived of effective assistance of counsel. The first of these occurred during the cross-examination of Tina Brown when defense counsel asked the open question: "Were there any other incidences regarding Mitchell other than him coming over to your house, being friendly with the children there? Did anything else occur between them?" Ms. Brown responded: "Yes. He came over, was it the 15th, with a nine millimeter gun pointing it at my children." [Tr. 150-151.] Later on cross-examination, she explained she did not call the police to report the incident because appellant said the gun was not loaded. Instead, she asked her father to go outside and tell him to leave. [Tr. 153.]
Appellant complains that this testimony portrays him "as a dangerous, gun-toting menace to children," and argues that there is no tactical justification for allowing or facilitating the introduction of testimony. Felicia Gillespie, called as a witness by the defense, volunteered a similar statement concerning the incident of the 15th, but appellant does not mention that testimony in connection with his claim of ineffective assistance of counsel. Gillespie portrayed the incident as appellant showing off, trying to impress her cousin and her.
We do not find that the record clearly establishes whether defense counsel was surprised by the testimony relating to the gun incident or if the response was anticipated and sought to suggest bias against appellant on Tina Brown's part. In either case, any prejudice to appellant that may have resulted from the brief reference to the incident was minimal. See Hairston, supra, at 8-9. Appellant has not shown, under the standards outlined above, that his trial attorney's performance either fell below an objective standard of reasonable representation or that the attorney's failure to attempt to exclude the testimony prejudiced his defense so as to deprive him of a fair trial.
Appellant's second reason for asserting that he was deprived of effective assistance of counsel is that his attorney failed to object to the trial court's jury instruction concerning the meaning of "proximate result," as used in R.C. 2903.02(B). We analyzed the court's jury instruction in detail when overruling appellant's first assignment of error. For the reasons we stated in finding no reversible error with respect to the jury instruction on causation, we reject appellant's argument that defense counsel's failure to object to the instruction is evidence of ineffective assistance of counsel. State v. Jackson,92 Ohio St.3d 436, 447, 2001-Ohio-1266.
Next appellant urges that his trial attorney's failure to object or move to strike the statement by Detective Viduya, referring to appellant as "pretty much a troublemaker," constitutes ineffective assistance of counsel. As stated above in our discussion of appellant's second assignment of error, his trial counsel chose not to object at that juncture and did not cross-examine the witness concerning the statement he volunteered. Any prejudicial effect of that testimony may have been lessened by effective cross-examination. See State v. Fisher (2000), Franklin App. No. 99AP-1497, at 13; quoting State v. Brown (1988),38 Ohio St.3d 305, 311. However, it is readily conceivable that defense counsel recognized how an objection, motion to strike or additional cross-examination would call attention to the comment and, perhaps, result in the jury attaching undue weight to it. The decision to not object to admission of the statement falls within boundaries of a trial attorney's tactical latitude and the failure to object did not deprive appellant of a fair trial. The failure to object, by itself, will generally not sustain a claim of ineffective assistance of counsel, particularly where, as here, the failure does not substantially violate an essential duty or otherwise prejudice the accused in a significant way. State v. Hanna, 95 Ohio St.3d 285, 308, 2002-Ohio-2221.
Appellant's final assertion that he was denied effective assistance of counsel relates to his attorney's decision not to request dismissal based upon the prosecution's destruction of, or failure to preserve, allegedly exculpatory evidence. In deciding appellant's third assignment of error, we found that his claim that he was deprived of due process in relation to the non-production or non-preservation of carpet samples to be without merit. His trial attorney's failure to pursue that issue, given a lack of evidence that the prosecution acted in bad faith, does not constitute ineffective assistance of counsel.
Since none of these claims establishes ineffective assistance of counsel, appellant's fourth assignment of error lacks merit and is, accordingly, overruled.
In support of his last assignment of error, appellant argues that the trial court imposed consecutive terms of incarceration of 15 years to life on the murder convictions without making and expressing the findings required by R.C. 2929.14(E)(4). A sentencing court may require an offender to serve consecutive prison terms if it finds that "consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." R.C. 2929.14(E)(4). The court must also find one of the following: (a) that the multiple offenses were committed while the offender was awaiting trial or sentencing, was under a residential, non-residential or financial sanction as provided by R.C. 2929.16, 2929.17
or 2929.18, or was under post-release control for a prior offense; (b) that "[t]he harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct"; or (c) that "[t]he offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." R.C. 2929.14(E)(4). Pursuant to R.C. 2929.19(B)(2)(c), the trial court must also give its reasons for imposing consecutive sentences if it decides to do so.
The findings and reasons supporting the imposition of consecutive sentences must be made "on the record," that is, in open court and in the presence of the offender. State v. Moore, Cuyahoga App. No. 79353, 2002-Ohio-2133, at ¶ 60. While the trial court does not need to quote the provisions of R.C. 2929.14(E)(4) verbatim, it must adequately discuss and articulate the necessary findings in order to comply with the statutory requirements. State v. Hurst, Franklin App. No. 01AP-77, 2001-Ohio-4082, at ¶ 7-8.
The trial court's judgment entry simply recites that it "has weighed the factors as set forth in the applicable provisions of * * * R.C.2929.14" in connection with the sentences imposed. On the record, however, after announcing its decision to impose consecutive sentences, the trial court in this case read into the record the language from R.C.2929.14(E)(4), quoted above, that enumerates the findings required to support the consecutive terms. The court then stated:
 * * * [W[e have been in trial in this case for some seven days * * * obviously we have involved in this case the death of the very young, defenseless children. So I have imposed consecutive sentences in this case, each of them being 15 to life, for the death of the three children.
 * * * I think consecutive sentences are necessary to punish the offender, they are not disproportionate to the seriousness of the offender's conduct, i.e. that which we all know, and that is three defenseless children are dead as a result of his conduct, and finally that the harm caused by the multiple offenses was so great and unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 * * * I think to do otherwise would demean the seriousness of the offense." [Tr. 1101-1102.]
We find that this pronouncement of the court's reasons for imposing consecutive sentences complies with the requirements of R.C. 2929.14(E)(4). Moreover, the record in this case supports the trial court's reasoning. The only aspect of those requirements not expressly elaborated upon by the court was whether or not consecutive sentences are disproportionate to the danger appellant poses to the public. We have recognized that consecutive sentences protect the public by striving to deter criminal conduct demonstrated by the commission of multiple offenses and, where there are multiple victims, the imposition of consecutive sentences is reasonable to hold the defendant accountable for crimes committed against each victim. State v. Wilson (2000), Franklin App. No. 99AP-1259, at 20-21. We have also recognized that the seriousness of the conduct for which a defendant is convicted can demonstrate a disregard for the law and the safety of others that poses a danger to the public. Id. at 22. Such a conclusion is implicit in the trial court's analysis and is supported by the overall record in this case. Appellant's seventh assignment of error is overruled.
Having overruled all seven assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
TYACK, P.J., and PETREE, J., concur.
McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] Appellant, 17 years of age at the time of the alleged offenses, was initially charged with multiple delinquency counts before the Juvenile Branch of the Division of Domestic Relations of the Franklin County Court of Common Pleas. A judge of that court granted the state's motions, pursuant to R.C. 2151.26, to relinquish jurisdiction and transfer the matters to the General Division of the Franklin County Court of Common Pleas Court for adult prosecution. The indictment in this case was returned by the Grand Jury and filed August 17, 2000.