OPINION
{¶ 1} Appellant, Jennifer L. Jeffries, appeals the judgment entry of the Lake County Court of Common Pleas resulting from a jury verdict convicting her of one count of trafficking in cocaine, in violation of R.C. 2925.03(A)(1) and (C)(4)(a); one count of tampering with evidence, in violation of R.C. 2921.12(A)(1); one count of involuntary manslaughter, with a firearm specification, in violation or R.C.2903.04(A) and R.C. 2941.145; one count of complicity to robbery, with a firearm specification, in violation of R.C. 2923.03(A)(2) and R.C.2941.145; and one count of felony murder, with a firearm *Page 2 
specification, in violation of R.C. 2903.02(B) and R.C. 2941.145. Jeffries also appeals from the trial court's judgment entry of sentence. We reverse the judgment entry of the trial court and remand this matter to the trial court for further proceedings.
 {¶ 2} The charges against Jeffries arose from an incident which occurred in the early morning hours of December 4, 2001, resulting in the death of twenty-one-year-old Dustin Spaller. A fisherman discovered Spaller's body at approximately 3:09 a.m., in a small gravel parking lot located inside Recreation Park, in Painesville, Ohio.
 {¶ 3} An autopsy revealed that Spaller had died of bleeding from a gunshot wound. He also appeared to have been seriously beaten and had several blunt force head wounds consistent with being hit by the muzzle of a gun. The coroner estimated the time of Spaller's death to have occurred between 1:30 and 3:00 a.m. on December 4, 2001.
 {¶ 4} At approximately 4:48 a.m., a dispatcher from the Lake County Sheriff's Department received a 9-1-1 call from Jeffries claiming that she and her friend, Spaller, were victims of a robbery which had occurred earlier that morning.
 {¶ 5} Detective Bob Sayer, of the Painesville Police Department, was initially assigned as the lead investigator in the case. Following the 9-1-1 call, Sayer headed to 91 Branch Avenue, where Jeffries lived with her grandparents and her two small children. After gathering some general information about the incident, Sayer asked Jeffries to accompany him to the police station to give a victim statement.
 {¶ 6} As they were preparing to leave Jeffries' grandmother's home, Sayer, who had parked next to Jeffries' vehicle in the driveway, noticed what appeared to be a blood smear along the passenger door, as well as blood spots and a bloody handprint *Page 3 
on various portions of the vehicle. Sayer radioed to have the vehicle towed to the Lake County Crime Lab. At approximately 6:15 a.m., Sayer and Jeffries arrived at the Painesville Police Department to complete a victim statement.
 {¶ 7} Jeffries told Sayer essentially the same version of events she told the dispatcher. She stated that she arrived at Tony's Subway Inn at around 11:00 p.m. for a few drinks. While at Tony's, she ran into David Tills, Dustin Spaller, and Brett Cameron, and the four hung out until closing time. Spaller and his friends expressed an interest in buying about $100 worth of crack cocaine, and asked Jeffries if she could help "hook him up." Jeffries told Sayer that she agreed to take him around town to see if they could find someone willing to sell crack to him.
 {¶ 8} With Jeffries at the wheel, the two proceeded first to the BP station and then to Sanders Avenue, where their search for drugs proved unsuccessful. Eventually, Jeffries and Spaller met the three men at Argonne Arms, who agreed to sell some crack to them. Upon arriving at Recreation Park, the two were ambushed, and she was robbed by the aforementioned males. Jeffries claimed that immediately after Spaller fled his attackers, she got in her car, drove straight home, and notified police. While taking Jeffries' statement, Sayer testified that he noticed what appeared to be a blood smear on Jeffries' pants. Jeffries explained that she must have brushed up against her car. Sayer then took photographs of some bruises and red marks on Jeffries' arms and neck, and drove her home from the police station between 8:30 and 9:00 a.m.
 {¶ 9} In the meantime, other officers continued the investigation. As part of the investigation, Detective Manley, of the Painesville Police Department, interviewed *Page 4 
Spaller's friends, David Tills and Brett Cameron, and a different version of events began to emerge.
 {¶ 10} Tills stated that around 3:00 p.m. on December 3, 2001, he and Cameron accompanied Spaller on a trip to Pennsylvania, where Spaller had been assigned the task of delivering a car from the dealership where he worked to another dealership and retrieving a second car in exchange.
 {¶ 11} Upon returning to Ohio, the three decided to go to Just Teazin', an adult night club in Painesville, where they had drinks. Spaller was carrying a large amount of cash that night, and some time between midnight and 1:00 a.m., the three decided to leave Just Teazin' and go to Tony's Inn to see if they could find someone who would sell them $100 worth of crack.
 {¶ 12} While at Tony's, the men encountered Jeffries, whom Tills knew from school. Jeffries had sold the men drugs in the past. While the three were drinking and playing pool, Jeffries approached them. Spaller asked Jeffries if she had any crack to sell, producing a large wad of cash from his pocket to show her that he had money. Jeffries stated that she was not holding any drugs at the moment, but that she would check with others around the bar to see if anyone had any to sell.
 {¶ 13} Tills stated that he later saw Jeffries speaking with Jameson ("Tyrone") Jeffries, her then-estranged husband, who was also at Tony's that evening, outside the men's room. Eventually, Jeffries returned and told the men that they would meet at Recreation Park to consummate the deal. Tills protested, stating that he did not want to go to the park, but Spaller told Tills and Cameron to wait for him, and left Tony's with Jeffries. *Page 5 
 {¶ 14} After Spaller failed to return, Tills and Cameron attempted to reach Jeffries on her cell phone, but she failed to answer. The two men decided to go to Spaller's home to see if he had been dropped off there.
 {¶ 15} Upon arriving at Spaller's home and failing to find him there, Tills again attempted to contact Jeffries and was finally successful. Over the course of the night, Tills had several phone conversations with Jeffries. During these conversations, Jeffries gave Tills conflicting accounts of what happened.
 {¶ 16} Based upon this conflicting information, Sayer called Jeffries on the afternoon of December 4, 2001, and asked her if she would return to the police station. Jeffries agreed to do so, and returned to the station shortly after 2:00 p.m. Upon her return to the station, Sayer informed Jeffries that there were some discrepancies between the statement that she had given earlier and the statements given by Tills and Cameron. Sayer asked her if she wanted to clarify her earlier victim statement. Jeffries recounted her earlier statement without any changes. Sayer then read Jeffries her rights from a Miranda card and asked her to sign it, but she refused. Sayer proceeded to inform Jeffries of the inconsistencies between her statement and those of Tills and Cameron, and indicated that he believed she may not have been entirely truthful with him earlier, and that he was beginning to think of her less as a victim and more as a potential suspect. Jeffries, however, refused to change the essential details of her story, and suggested that Tills and Cameron were lying. After Sayer had finished questioning Jeffries, he drove her back to her home. *Page 6 
 {¶ 17} Over the course of a year and a half, the investigation into the death of Spaller continued. Although some evidence was gathered which implicated Tyrone as the assailant, Jeffries had never corroborated this information.
 {¶ 18} On October 28, 2002, Jeffries submitted to a polygraph test, requested by her defense counsel. Pursuant to the test, Jeffries submitted a written statement to Maryann Feathers, the polygraphist, which indicated for the first time that Tyrone was Spaller's attacker.
 {¶ 19} In the spring of 2003, a meeting was held between representatives of the Lake County Public Defender's Office and representatives of the Lake County Prosecutor's Office. At the meeting, the public defender indicated that Jeffries had passed a polygraph test. At the request of the prosecution, the results of this test, as well as the statement written by Jeffries, were forwarded to the Prosecutor's Office.
 {¶ 20} On May 7, 2003, the Prosecutor's Office and the Public Defender's Office, entered into a cooperation agreement, which provided, in relevant part, as follows:
 {¶ 21} "1. Jennifer Jeffries will cooperate with law enforcement officials and the Lake County Prosecutor's Office and agree to give a complete and truthful statement to the Painesville Police Department concerning her knowledge of the death of Dustin Spaller[,] including the names of all those involved in the murder and their actions[,] and any conversations Jennifer Jeffries had with any of said perpetrators and their statements regarding Dustin Spaller's death;
 {¶ 22} "2. Jennifer Jeffries agrees to submit to a polygraph examination conducted by an examiner chosen by the Lake County Prosecutor's Office, to confirm that the information she has provided to law enforcement officials is the complete truth; *Page 7 
 {¶ 23} "3. Jennifer Jeffries, upon successfully passing the polygraph examination, will continue to cooperate with law enforcement officials prior to and throughout any trials or hearings that may result regarding the death of Dustin Spaller, and will agree to be available for debriefing and/or trial preparation by staff of the Lake County Prosecutor's Office and appropriate law enforcement agencies, and will agree to provide truthful testimony in Court in any of said trials or hearings;
 {¶ 24} "4. It is understood that if Jennifer Jeffries does not successfully pass the polygraph to the satisfaction of the Lake County Prosecutor and/or fails to cooperate with the Lake County Prosecutor or law enforcement, this agreement will be null and void.
 {¶ 25} "5. It is understood that it may be necessary for Jennifer Jeffries, in order to tell the whole truth about the events * * * to disclose matters concerning drug usage and/or trafficking. Any statements made by Ms. Jeffries in this regard will not be used against her in any later proceedings, including and especially in the event that this agreement should fail;
 {¶ 26} "6. As part of her cooperation with law enforcement officials, it is agreed that Jennifer Jeffries will, if requested by law enforcement official [sic], participate in monitored and recorded phone conversations and/or wearing wires to monitor and record conversations, in addition to participating in other investigative techniques;
 {¶ 27} "7. Previously, Jennifer Jeffries was charged with one count of Trafficking in Cocaine, * * * and one count of Tampering with Evidence * * *, in relation to the Spaller homicide investigation. These two charges were dismissed to conduct further investigation. At the conclusion of all cases * * * in which Jennifer Jeffries may be called *Page 8 
to testify on behalf of the State of Ohio involving the Spaller homicide, Jennifer Jeffries, regardless of the result of said cases, will plead Guilty to a charge of Obstruction of Justice * * *, in violation of O.R.C. 2921.32;
 {¶ 28} "8. It is understood between the parties that a sentence will be imposed on the charge of Obstructing Justice * * * and that sentencing is the sole discretion of the judge. However, at the time of Jennifer Jeffries' sentencing[,] the Lake County Prosecutor's Office will make known to the sentencing court the full extent and nature of Ms. Jeffries' cooperation and will recommend community control sanctions to be served concurrently with the community control sanctions she is currently under;
 {¶ 29} "9. It is understood between the parties that if all previously mentioned conditions are met, that Jennifer Jeffries will not be subjected to any further criminal charges in relation to the death of Dustin Spaller; * * * ."
 {¶ 30} The agreement was signed by Jeffries, her defense attorneys, and representatives from the Lake County Prosecutor's Office.
 {¶ 31} On June 2, 2003, Jeffries provided a statement to Sayer in anticipation of the second polygraph test. This statement furnished greater detail of the events occurring during the early morning hours of December 4, 2001. It indicated that when she stopped her car, she got out to "take a pee," when a man approached the car from behind the fence. Jeffries claimed that she did not recognize the man at first and headed back to her car. Jeffries stated that it was only when the passenger door was yanked open that she realized the man who had appeared from behind the fence was Tyrone, her then-estranged husband (Jeffries and Tyrone were divorced in 2002). Jeffries stated that Tyrone punched Spaller in the face, before Spaller either got out of *Page 9 
the vehicle or was pulled out by Tyrone. Once outside of the car, the two men began fighting. As the men were fighting, Jeffries stated that she noticed a gun in Tyrone's hands. Jeffries then heard the gun go off, and she jumped into her car and left the area.
 {¶ 32} On June 23, 2003, a polygraph was conducted on behalf of the prosecution by William Evans at the Lake County Prosecutor's Office. Jeffries arrived with her defense counsel, Carolyn Kucharski. Also present were Assistant Prosecutor Karen Sheppert and Sayer.
 {¶ 33} Initial results of the polygraph test indicated that Jeffries was not being truthful with respect to one or more of her responses. All persons involved discussed the matter, trying to determine what Jeffries could do to achieve a passing result. This process included additional questioning and testing. Jeffries eventually left the Prosecutor's Office without having successfully completed the test.
 {¶ 34} Two weeks after the failed polygraph test, Jeffries did not report for probation, and a warrant was issued for her arrest. Police were unable to locate her until March 2004.
 {¶ 35} On July 18, 2003, after she had disappeared, the Lake County Grand Jury re-indicted Jeffries, by way of secret indictment, on one count of trafficking in cocaine, a felony of the fifth degree (count one), and one count of tampering with evidence, a felony of the third degree (count two). A warrant for Jeffries' arrest on the indictment was issued. In March 2004, through her attorney, she waived her right to be present at her arraignment on these charges. The trial court entered a "not guilty" plea on her behalf. *Page 10 
 {¶ 36} In April 2004, with her defense counsel present, Jeffries was again interviewed by Sayer concerning the events of December 4, 2001. Her counsel advised her to talk to Sayer because he was of the belief that murder charges could be avoided if she cooperated with the police and because he believed that the state of Ohio was still seeking her cooperation.
 {¶ 37} On September 20, 2004, the grand jury returned a second indictment charging Jeffries with one count of involuntary manslaughter with a firearm specification, a felony of the first degree (count three); two counts of complicity to robbery, felonies of the second degree (counts four and five), with firearm specifications; and one count of felony-murder, a felony of the first degree (count six), with a firearm specification. These charges were consolidated with the aforementioned charges. Jeffries waived her right to be present at this arraignment and the trial court entered pleas of "not guilty" on her behalf with respect to the additional charges.
 {¶ 38} On January 21, 2005, Jeffries' defense counsel filed a "Motion to Enforce Post Indictment Cooperation/Plea Agreement," and a motion to suppress. The trial court denied Jeffries' motion to enforce the cooperation agreement and granted in part, and denied in part, her motion to suppress. The trial court held a two-day hearing on this motion beginning on January 27, 2005. Relevant to this appeal, the trial court denied Jeffries' motion to suppress with respect to the statement made to Feathers, but granted her motion to suppress with respect to the statement made to Sayer on June 2, 2003. The trial court denied the motion to suppress the statement made to Feathers on the basis that the statement was not made by Jeffries during the course of plea discussions. *Page 11 
 {¶ 39} The matter proceeded to a jury trial on February 4, 2005. On February 17, 2005, the jury reached its verdict, finding Jeffries guilty as charged on all charges against her, except for one count of complicity to robbery (count four), for which she was acquitted.
 {¶ 40} The case proceeded to sentencing on February 17, 2005, at which time the trial court sentenced Jeffries to serve one year for trafficking in cocaine, to be served concurrently with her other sentences; four years for the tampering with evidence charge, to be served consecutively; ten years for involuntary manslaughter, to be served concurrently; and fifteen years to life on the felony-murder charge, to be served consecutively. Jeffries was not sentenced for her complicity to robbery conviction, since this charge was merged with the felony-murder charge for the purposes of sentencing.
 {¶ 41} In addition to the aforementioned sentences, Jeffries was additionally sentenced to one year for each of the three firearm specifications, to be served concurrently with each other, and to be served prior to and consecutive with the other terms, for a total prison term of twenty-two years to life. Jeffries was given credit for three hundred sixteen days for time served.
 {¶ 42} Jeffries timely appealed, assigning the following as error:
 {¶ 43} "[1.] The trial court abused its discretion when it denied [appellant's] motion to enforce the cooperation agreement.
 {¶ 44} "[2.] The trial court erred when it denied [appellant's] motion to suppress in violation of her due process rights guaranteed under the Fifth, Sixth, and *Page 12 Fourteenth Amendments of the United States Constitution and Section 10, Article 1
of the Ohio Constitution.
 {¶ 45} "[3.] The causation jury instructions given by the trial court undercut the mens rea requirement for the charges and thus violated [appellant's] rights to due process and fair trial as guaranteed by theFifth and Fourteenth Amendments to the United States Constitution.
 {¶ 46} "[4.] The trial court committed reversible error when it refused to submit [appellant's] proposed jury instruction on superceding and intervening causes in violation of [appellant's] rights to due process and fair trial as guaranteed by the Fifth andFourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.
 {¶ 47} "[5.] The trial court committed plain error when it mischaracterized the degree of one of the offenses in its instruction to the jury and limited the jury's consideration of alternative offenses in violation of [appellant's] rights to due process and fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.
 {¶ 48} "[6.] The trial court erred to the prejudice of the [appellant] when it instructed the jury on flight contrary to the proffered evidence.
 {¶ 49} "[7.] The trial court erred to the prejudice of [appellant] when it denied her motion for acquittal made pursuant to Crim.R. 29(A).
 {¶ 50} "[8.] The trial court erred to the prejudice of [appellant] when it returned a verdict of guilty against the manifest weight of the evidence. *Page 13 
 {¶ 51} "[9.] The trial court erred to the prejudice of [appellant] when it failed to dismiss the felony-murder charge due to its being in violation of [appellant's] due process and equal protection rights and rights against cruel and unusual punishment as guaranteed by the Ohio and United States Constitutions.
 {¶ 52} "[10.] The trial court ruled contrary to law when it ordered consecutive sentences.
 {¶ 53} "[11.] The trial court erred when it sentenced [appellant] to consecutive sentences based upon a finding of factors not found by the jury or admitted by [appellant] in violation of [appellant's] state and federal constitutional rights to trial by jury."
 {¶ 54} These assignments of error will be treated out of order.
 {¶ 55} In her second assignment of error, Jeffries raises two separate issues for our consideration: Jeffries first argues that the trial court erred and abused its discretion by failing to suppress the statement she made to Sayer on the afternoon of December 4, 2001, since this statement was made when she was "under extreme emotional trauma and stress at the time of the questioning and could not validly waive her Miranda rights." Secondly, Jeffries argues that the trial court improperly failed to suppress the written statement she had submitted to Maryann Feathers, a polygraphist hired by defense counsel, on October 28, 2002. Her reasoning is that, under Evid.R. 410, this statement was made in contemplation of entering into a plea negotiation and should have been suppressed.
 {¶ 56} At a suppression hearing, the trial court acts as the trier of fact and must weigh the evidence and judge the credibility of the witnesses. State v. Hill (1996), *Page 14 75 Ohio St.3d 195, 208. Since the trial court is in the best position to resolve the factual issues, an appellate court is bound to accept the trial court's factual determinations as long as they are supported by competent and credible evidence. State v. Searls (1997),118 Ohio App.3d 739, 741, citing State v. Mills (1992), 62 Ohio St.3d 357, 366. Once the appellate court accepts the trial court's factual determinations, the appellate court must "independently determine as a matter of law whether the acceptable legal standard has been satisfied." See State v.Burrows (Apr. 19, 2002), 11th Dist. No. 2000-T-0089, 2002 Ohio App. LEXIS 1918, at 8, citing State v. Retherford (1994), 93 Ohio App.3d 586,592.
 {¶ 57} The United States Supreme Court, in Miranda v. Arizona (1966),384 U.S. 436, 444, held that the state may not use statements stemming from custodial interrogation, unless it demonstrates that procedural safeguards were taken to secure the defendant's privilege against self-incrimination. These safeguards include Miranda warnings, one of which is the right to end questioning at any time until an attorney is obtained, unless there is an intelligent, knowing and voluntary waiver of this privilege. Id.
 {¶ 58} Police officers are not required to administer Miranda warnings to everyone whom they question. This is true even if the questioning takes place in the police station or the person questioned is the individual the police suspect. Oregon v. Mathiason (1977), 429 U.S. 492,495. The safeguards prescribed by Miranda become applicableonly after an individual becomes subject to custodial interrogation.Berkemer v. McCarty (1984), 468 U.S. 420, 440. Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into *Page 15 
custody or otherwise deprived of his freedom of action in anysignificant way." Miranda, supra, at 444. (Emphasis added.)
 {¶ 59} "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but `the ultimate inquiry is simply whether there (was) a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" Stansbury v. California (1994), 511 U.S. 318, 322, citingCalifornia v. Beheler (1983), 463 U.S. 1121, 1125. Whether a custodial interrogation has occurred is based upon an objective inquiry into the facts and circumstances surrounding the questioning — in other words, how a reasonable person in a similar situation would have understood it. Id. at 325; State v. Biros, 78 Ohio St.3d 426, 440. The subjective views of the suspect and the interrogating officers have no bearing upon this initial determination. Stansbury, supra, at 318. However, the officer's knowledge or beliefs, "if they are conveyed * * * by word or deed, to the individual being questioned[,]" may have some bearing upon the custody issue, but only if they would have affected how a reasonable person in that position would perceive his or her freedom to leave. Id. at 325.
 {¶ 60} According to testimony given at the suppression hearing, Jeffries voluntarily agreed to return to the police station to go over her earlier statement. Jeffries had earlier consented to have her vehicle towed to the Lake County Crime Lab for analysis. She was driven to the station for this second interview by Sayer in an unmarked police vehicle, as she had been earlier in the day. The interview was conducted in a police trailer being used by the detective bureau, which was the same location and in the same manner as before. Sayer testified that the door to the police *Page 16 
trailer was unlocked. It is clear from the record that by the conclusion of the second interview Jeffries was a suspect.
 {¶ 61} Upon arrival at the police trailer, Sayer informed Jeffries that there were discrepancies between her earlier statement and statements subsequently received from Tills and Cameron. He advised her that he could not treat her "as a victim anymore." At this juncture, Jeffries was still holding herself out as a victim who was at the police station to make a victim's statement. In this context, Jeffries' subjective voluntary motivation to answer questions at the police station clearly makes the officer's objective motive to continue the encounter legally irrelevant. Notwithstanding Sayer's statement to her, Jeffries still considered herself a victim. Thus, there were no reliable indicia of custody in this encounter.
 {¶ 62} Although Sayer never suggested that Jeffries was under arrest, as a precautionary measure, Jeffries was read her Miranda rights from a card and asked if she understood her rights. Jeffries responded in the affirmative. Sayer then asked Jeffries to sign the Miranda card, but she refused. Sayer made a note of this, and then proceeded with questioning her. There is no evidence that Jeffries ever demanded an attorney or requested that the police cease questioning. Approximately two hours later, Jeffries was driven back to her home by Sayer.
 {¶ 63} In determining the voluntary nature of a waiver ofMiranda rights, a reviewing court will look at the "totality of the circumstances." State v. Gumm (1995), 73 Ohio St.3d 413, 429. In deciding whether a defendant's statement is voluntary, the trial court should consider factors including, "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the *Page 17 
existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v. Worley, 11th Dist. No. 2001-T-0048, 2002-Ohio-4516, at ¶ 161.
 {¶ 64} In considering the facts from the second interview on December 4, 2001, none of the aforementioned factors lead us to conclude that Jeffries' statements to police either before or after the Miranda warnings were administered were anything but voluntary, based upon the totality of the circumstances. The mere refusal to sign a written acknowledgment of waiver of Miranda rights is not conclusive evidence of such waiver being involuntary. State v. Scott (1980), 61 Ohio St.2d 155,161; State v. Harvey (Dec. 31, 1990), 12th Dist. No. CA90-06-117, 1990 Ohio App. LEXIS 5833, at 2.
 {¶ 65} We conclude that Jeffries' statements, both before and after she was Mirandized, to the police at 2:15 p.m., on December 4, 2001, were given voluntarily and/or were subject to a voluntary waiver of herMiranda rights.
 {¶ 66} The statements given to the polygraphists, on October 28, 2002 and June 2, 2003, before and during plea negotiations, present a much different question. Jeffries argues that her written statement given to Maryann Feathers on October 28, 2002, in preparation for the polygraph test administered at the request of her defense counsel, and later given to the prosecution, should be suppressed. She reasons that the statement was given during the course of plea discussions and, therefore, subject to exclusion under Evid.R. 410. In this statement, Jeffries disclosed that she was responsible for putting together the drug transaction between Spaller and Tyrone, that she was present in Recreation Park when Spaller was attacked and shot, and that Tyrone was the shooter. *Page 18 
 {¶ 67} Evid.R. 410 provides for the exclusion of "[a]ny statement made in the course of plea discussions in which counsel for the prosecuting authority or for the defendant was a participant and that [did] not result in a plea of guilty * * *." Evid.R. 410(A)(5).
 {¶ 68} "Upon appellate review, `the admission or exclusion of relevant evidence rests within the sound discretion of the trial court and its decision regarding that evidence cannot be reversed absent an abuse of that discretion.'" State v. Beach, 6th Dist. No. L-02-1087,2004-Ohio-5232, at ¶ 42, citing State v. Combs (1991),62 Ohio St.3d 278, 284.
 {¶ 69} The Supreme Court of Ohio has stated that the test of "whether an accused's statements were made during plea discussions is to be determined on a case-by-case basis in light of all the facts." State v.Frazier (1995), 73 Ohio St.3d 323, 337. To this end, that court adopted a two-part test: (1) the trial court must determine whether, at the time the statements were made, the accused had a subjective expectation that a plea was being negotiated; and (2) the trial court must then determine whether such expectation was reasonable under the circumstances. Id.
 {¶ 70} Here, the evidence adduced at the suppression hearing showed that the statement was made to Feathers on October 28, 2002, in connection with a polygraph test to be performed at defense counsel's request. Attorney Grieshammer, one of Jeffries' attorneys, testified at the suppression hearing that a polygraph test was requested by his office because "we were testing [Jeffries] on the new story, if you will, that she told us." That is, his office wished to verify the accuracy of the story Jeffries was then telling them concerning the events of December 4, 2001. *Page 19 
 {¶ 71} Evidence also showed that discussions related to a possible plea negotiation were not commenced until the Spring of 2003. At that time, defense counsel mentioned to the prosecutor that Jeffries had passed a polygraph test. The state of Ohio requested a copy of the statement made to Feathers together with Feathers' report for purposes of formulating questions for the state's own polygraph examination.
 {¶ 72} Even though the parties were not engaged in active plea negotiations in October 2002, we conclude that when the state requested a copy of the October 28, 2002 statement and polygraphist's report, and when Jeffries complied with that request, those documents were in furtherance of verifying the validity of Jeffries' statements for the purpose of offering her a deal in exchange for her testimony, i.e., a plea negotiation.
 {¶ 73} Unlike the appellant in the Frazier case, who made statements to agents of the state in the hope of obtaining a favorable plea bargain, and where the court stated that his subjective intent must be determined "at the time of the statements," Jeffries' subjective intent on October 28, 2002, is not germane because her statement was made to Feathers, who was not an agent of the state, and because Evid.R. 410 merely requires that the statement be "made in the course of plea discussions." Jeffries' statement, though given months earlier, did not come to light until the Spring of 2003. At that time, it was furnished to the state at its request for the purpose of preparing questions for its own polygraphist. But for the state's request for the statement and polygraphist's report, they would not have been "made in the course of plea discussions," because these documents are privileged and constitutionally *Page 20 
protected under Jeffries' Fourth and Fifth Amendment privileges and would not have been provided to the prosecutor otherwise.
 {¶ 74} Further, as for Jeffries' subjective expectation that a plea bargain was being negotiated, she may not have had a subjective expectation that her counsel was preparing for a plea negotiation at the time the statement was given, but she definitely had such an expectation by the time the statement was presented to the prosecutor in the Spring of 2003. The October 28, 2002 statement and report were integral to the "course of plea negotiations" and gave Jeffries a bargaining chip that she would not otherwise have had if she had not obtained a positive result from the October 28, 2002 polygraph test.
 {¶ 75} Thus, we deem Jeffries' statement and report from the October 28, 2002 polygraph test to have been "made in the course of plea negotiations."
 {¶ 76} Under these circumstances, we conclude the trial court abused its discretion by not suppressing this statement and report.
 {¶ 77} Moreover, we find merit to Jeffries' argument that the admission of her October 28, 2002 statement to Feathers "forced" defense counsel to waive the properly suppressed statement made to the police on June 2, 2003. This latter statement had previously been suppressed by the court. While it is well-settled that the exclusionary provisions of Evid.R. 410 are subject to waiver, such waiver must be knowing and voluntary. United States v. Mezzanatto (1995), 513 U.S. 196, 210;State v. Miller (Oct. 31, 1997), 2nd Dist. No. 15552, 1997 Ohio App. LEXIS 4774, at 7-8. A review of both statements (October 28, 2002 and June 2, 2003) reveals that there were substantial additional details in the June 2, 2003 statement which were not part of the statement *Page 21 
Jeffries previously made to Feathers. Significantly, the thrust of the June 2, 2003 statement, which was properly suppressed by the trial court as a statement subject to exclusion under Evid.R. 410, was that the shooting was accidental. Therefore, defense counsel, as part of the theory of the case, waived suppression of the June 2, 2003 statement in order to let in additional evidence that the shooting was accidental, in an effort to explain facts improperly put into evidence from the October 28, 2002 statement. Based upon the trial court's ruling in regard to the statement given to Feathers on October 28, 2002, the defense was left with no other viable alternative after Feathers' statement was admitted. The trial court, in effect, let the cat out of the bag by allowing Feathers' statement into evidence, but then suppressed any explanation of how it escaped.
 {¶ 78} For the reasons indicated, the trial court committed reversible error when it allowed the October 28, 2002 statement to be heard by the jury. Jeffries' statements to the 9-1-1 dispatcher and to the police on December 4, 2001, are admissible.
 {¶ 79} We shall now consider whether the error of the trial court was harmless error.
 {¶ 80} While the Sixth and Fourteenth Amendments do not require a perfect trial, they do mandate fairness. Lutwak v. United States (1953),344 U.S. 604. As stated by the United States Supreme Court, "the right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusation."Chambers v. Mississippi (1973), 410 U.S. 284, 294.
 {¶ 81} "Nevertheless, [a finding that the trial court committed error] does not require an automatic reversal. A constitutional error can be held harmless if we *Page 22 
determine that it was harmless beyond a reasonable doubt. Chapman v.California (1967), 386 U.S. 18, 24. Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. Id. at 23; State v. Madrigal (2000),87 Ohio St.3d 378, 388." State v. Conway, 108 Ohio St.3d 214,2006-Ohio-791, at ¶ 78.
 {¶ 82} The Eighth Appellate District has stated the matter another way, that the remaining evidence by itself must constitute "overwhelming" proof of guilt. Quoting a prior decision of the Supreme Court of Ohio and the United States Supreme Court, that court stated:
 {¶ 83} "`Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless "beyond a reasonable doubt" if the remaining evidence alone comprises "overwhelming" proof of defendant's guilt.' State v. Williams (1983),6 Ohio St.3d 281 * * *, quoting Harrington v. California (1969),395 U.S. 250, 254 * * *." State v. Person,167 Ohio App.3d 419 * * *, 2006-Ohio-2889, at ¶ 32. (Parallel citations omitted.)
 {¶ 84} A fair reading of the record before us clearly demonstrates two things. First, absent the statements of appellant to the polygraphists, there is no "overwhelming" evidence of her guilt in this matter; and certainly, no proof beyond a reasonable doubt. Secondly, it is clear that the erroneous admission of those statements did in fact "contribute" to her conviction.
 {¶ 85} The only remedy available is a new trial. *Page 23 
 {¶ 86} Jeffries' second assignment of error is with merit.
 {¶ 87} Even though we are reversing this matter on the basis of the second assignment of error, we still need to address assignments of error numbers one and seven. These other assignments of error concern the viability of the cooperation agreement, the sufficiency of the evidence, and whether the trial court should have dismissed the felony-murder charge. In the absence of a further discussion of these assignments of error, the question may arise on remand as to whether the issues challenged by those assignments of error are res judicata. SeeState v. Freeman (2000), 138 Ohio App.3d 408, 428. It follows from our discussion below that they are not res judicata.
 {¶ 88} In her first assignment of error, Jeffries contends that the trial court erred and abused its discretion by denying her motion to enforce the cooperation agreement, since, if a "good faith" standard is applied, she passed the polygraph test required by the state. In essence, Jeffries alleges that she substantially performed under the terms of the cooperation agreement, and thus, the trial court abused its discretion by not enforcing it.
 {¶ 89} The plain language of the cooperation agreement indicates that there are two circumstances under which the agreement would be considered "null and void:" either the results of the polygraph exam, as conducted and interpreted by an examiner of the prosecution's choosing, indicate that Jeffries' answers to questions related to the Spaller homicide were untruthful; or by Jeffries not making herself available to law enforcement and representatives of the prosecution for the purposes of investigation and trial preparation. Furthermore, paragraph five also contains a provision that *Page 24 
statements made by Jeffries concerning drug usage and/or drug trafficking will not be used against her, in the event the cooperation agreement "should fail."
 {¶ 90} Here, where Jeffries knowingly and voluntarily conditioned her agreement on the outcome of a polygraph test that required her "successfully passing" the test and that would be satisfactory to the prosecutor, without conditioning the agreement on the accuracy of such tests, we cannot say the trial court abused its discretion by finding that the cooperation agreement had been breached by Jeffries for her nontruthful participation in the polygraph.
 {¶ 91} Jeffries' breach was contemplated within the agreement. Paragraph five provided that "any statements made by Ms. Jeffries [regarding drug usage and/or drug trafficking] will not be used against her in any later proceedings, including and especially in the event that this agreement should fail." In the event of such failure or breach, the state of Ohio agreed not to use any statements concerning drug usage and/or drug trafficking against her in any future proceedings as consideration for her cooperation.
 {¶ 92} This clause is clearly enforceable. However, in this instance, due to the trial court's suppression of the June 2, 2003 statement, we conclude it to be harmless error.
 {¶ 93} Our analysis under the second assignment of error dovetails with this assignment of error in the sense that, had Jeffries not been compelled to let the June 2, 2003 statement into evidence due the trial court's erroneous ruling on her October 28, 2002 statement, the bar to using statements made by her regarding drug usage and/or drug trafficking (¶ 5 of Cooperation Agreement) would have been a viable defense strategy. As it was, the strategy was rendered meaningless by the trial court's ruling to *Page 25 
admit the October 28, 2002 statement into evidence. In making the decision to allow the June 2, 2003 statement to be admitted into evidence, Jeffries had to live with the consequences of her admissions regarding drug usage and/or drug trafficking that were contained in that statement.
 {¶ 94} We conclude that the trial court erred and abused its discretion in not enforcing the relevant provision that provided the remedy in case of breach, namely that any statements made by Jeffries regarding drug usage and/or trafficking cannot be used against her in any subsequent proceedings arising or occurring after the date of the contract, however, this error is harmless error in light of the fact that the trial court suppressed her subsequent statement of June 2, 2003, which included statements regarding drug usage and/or drug trafficking. In other words, the statement she made on June 2, 2003 was suppressed by the trial court and, in this respect, she was not prejudiced by the trial court's failure to enforce paragraph five of the agreement. At trial, she was still permitted to waive the inadmissibility of the June 2, 2003 statement, and she did so, not pursuant a direction from the trial court, but pursuant to her counsel's advice. The prejudice that did befall her from the admission of the June 2, 2003 statement resulted not from the trial court's failure to enforce paragraph five of the cooperation agreement, but from its ruling that the October 28, 2002 statement was admissible, as discussed in our analysis under the second assignment of error.
 {¶ 95} In sum, the trial court did not abuse its discretion in failing to enforce the entire cooperation agreement and further, even though the agreement contained a remedial provision, which was enforceable, under paragraph five of that agreement that *Page 26 
the trial court did not enforce, the trial court's failure to honor that paragraph was harmless error in light of the fact that it suppressed her statement of June 2, 2003.
 {¶ 96} Jeffries' first assignment of error is without merit.
 {¶ 97} In the seventh assignment of error, Jeffries argues that there was insufficient evidence to sustain her convictions and that the trial court should have granted her Crim.R. 29 motion at the conclusion of the state's case.
 {¶ 98} A Crim.R. 29 motion challenges the sufficiency of the evidence introduced by the state. State v. Schlee, 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at 12.
 {¶ 99} "[P]ursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." State v.Bridgeman (1978), 55 Ohio St.2d 261, syllabus.
 {¶ 100} We are reversing the judgment entry of the trial court pursuant to our analysis of assignment of error number two. We concluded that the trial court's admission of the statement and report of the polygraphist of October 28, 2002, was prejudicial error. If those documents and the statement of June 2, 2003, were excluded from evidence, a reasonable argument could be made that there was insufficient evidence to convict Jeffries. After all, it was her admissions in those statements that convicted her. However, in this part of our review, we confine ourselves to the sufficiency of the evidence as it was presented at Jeffries' trial, including both erroneously admitted and properly admitted evidence. Lockhart v. Nelson,488 U.S. 33, *Page 27 
34. In addition, we do not consider evidence that might be admissible at a future trial. Id. Justice Brennan explained the rationale for this consideration:
 {¶ 101} "When a defendant challenging his conviction on appeal contends both that the trial was infected by error and that the evidence was constitutionally insufficient, the court may not * * * ignore the sufficiency claim, reverse on grounds of trial error, and remand for retrial. Because the first trial has plainly ended, `retrial is foreclosed by the Double Jeopardy Clause if the evidence fails to satisfy the (constitutional standard for sufficiency). * * * if retrial is to be had, the evidence must be found to be legally sufficient, as a matter of federal law, to sustain the jury verdict." Justices of BostonMunicipal Court v. Lydon (1984), 466 U.S. 294, 321-322 (Brennan, J., concurring) (citations omitted). See, also, State v. Freeman (2000),138 Ohio App.3d 408, 424; State v. Jones, 11th Dist. No. 2001-A-0027, 2003-Ohio-621, at ¶ 7.
 {¶ 102} Jeffries focuses her argument in this assignment of error on the insufficiency of the evidence to sustain her convictions for trafficking in cocaine and involuntary manslaughter. However, our review of the evidence, admitted at the trial court level, including the statements of Jeffries that were erroneously admitted, leads us to conclude that sufficient evidence was presented to sustain her convictions for these offenses. Our conclusion is based solely upon the evidence as it was adduced at the first trial, and not upon the evidence as it will be forthcoming at a retrial.
 {¶ 103} Therefore, Jeffries' seventh assignment of error is without merit.
 {¶ 104} In light of our disposition of appellant's first, second, and seventh assignments of error, appellant's third, fourth, fifth, sixth, eighth, ninth, tenth, and eleventh assignments of error are moot. Accordingly, the judgment of the Lake County *Page 28 
Court of Common Pleas is reversed, and the matter is remanded for further proceedings consistent with this opinion.
WILLIAM M. O'NEILL, J., concurs,
DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.